IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joshua David Mellberg LLC, et al., | No. CV-14-02025-TUC-CKJ (CRP) |
| Plaintiffs, | **REPORT & RECOMMENDATION** |
| v. | |
| Jovan Will, et al., | |
| Defendants. | |

The following motions are pending before the Court: (1) Partial Motion to Dismiss filed by Defendants Jovan Will and Tree Fine (Doc. 22); (2) Motion to Dismiss filed by Defendant the Impact Partnership (Doc. 27); (3) Partial Motion to Dismiss filed by Defendants Fernando & Geovanna Godinez (Doc. 30); and (4) Motion to Dismiss filed by Defendant Carly Uretz (Doc. 34). The Motions came on for oral argument on November 13, 2014. For the following reasons, the Magistrate Judge recommends that the District Court, after its independent review: (1) deny in part and grant in party Defendant Will and Fine's Partial Motion to Dismiss; (2) grant Defendant Impact Partnership's Motion to Dismiss; (3) grant Defendant Godinez' Partial Motion to Dismiss; and (4) grant Defendant Uretz' Motion to Dismiss.

**BACKGROUND**

This case was removed from State Court and a First Amended Complaint ("FAC") was subsequently filed as a matter of right pursuant to Fed.R.Civ.P. 15(a)(1). Plaintiffs are Joshua David Mellberg, LLC, dba J.D. Mellberg Financial, and Joshua David Mellberg, an individual (collectively referred to as "JDM" or "Plaintiffs"). Joshua David Mellberg is the owner and President of JDM. (FAC, ¶16). He is a nationally known financial advisor

based in Tucson, Arizona, and "is a pioneer and leader in marketing and selling annuities via the Internet". (Id. at ¶¶17, 18). JDM Mellberg Financial is a nationwide retail and wholesale insurance agency specializing "in capturing internet based leads and supplying them to a network of agents across the country. JDM began developing internet based marketing and sales funnels in 2009." (FAC, ¶22; *see also id.* at ¶24 (JDM has expended in excess of $30 million refining its sales funnels)). JDM advertises and promotes the services and products that it offers, including annuities. (FAC, ¶¶20, 22). A significant portion of JDM's advertising and promotional activities in the field of annuities is conducted on the internet. (Id. at ¶21).

The individual defendants are former employees of JDM.[1] Also named as a Defendant is The Impact Partnership, which is a business entity that some or all of the individual defendants are alleged to have joined or otherwise furthered the interests thereof. (*See e.g.,* FAC, ¶¶62, 75, 87-88, 118, 138).

JDM alleges the following claims for relief: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (First Claim) against all Defendants; (2) violation of the Arizona Uniform Trade Secrets Act ("AUTSA"), A.R.S. §44-401, *et. seq.*, against all Defendants (Second Claim); (3) unfair competition against all Defendants (Third Claim); (4) breach of contract against Defendants Fine, Arceo and Godinez (Fourth Claim); (5) unjust enrichment against all Defendants (Fifth Claim); (6) breach of fiduciary duty/duty of loyalty against Defendants Fine and Will (Sixth Claim); (7) breach of duties regarding Alpha Academy Advisors, LLC, against Defendant Will (Seventh Claim); (8) trespass to chattel against Defendant Fine (Eighth Claim); (9) theft/conversion against Defendant Fine (Ninth Claim); (10) civil conspiracy against all Defendants (Tenth Claim); and (11) aiding and abetting against all Defendants (Eleventh Claim).

---

[1] The record reflects that the following Defendants have not been served with the April 25, 2014 FAC: John Arceo and Jane Doe Arceo, and Patricia Latham and John Doe Latham. At the hearing, counsel for Plaintiffs stated that a process server had not been successful in attempts to serve John Arceo. Counsel did not address the issue of service on the Lathams.

1    Pursuant to Fed.R.Civ.P. 12(b)(6), Defendants Will[2], Fine[3], Godinez[4], Uretz[5], and

2    The Impact Partnership (referred to collectively as "all moving Defendants") seek

3    dismissal of JDM's Second, Third, Fifth, Tenth, and Eleventh Claims for failure to state a

4    claim.  Additionally, Defendants Fine and Godinez seek dismissal of JDM's Fourth Claim

5    for relief for failure to state a claim, and Defendants Fine and Will seek dismissal of JDM's

6    Sixth Claim for relief for failure state a claim.

7    **STANDARD**

8    "Federal pleading rules call for 'a short and plain statement of the claim showing

9    that the pleader is entitled to relief[.]"  *Johnson v. City of Shelby, Mississippi,* __ U.S. __,

10   135 S.Ct. 346 (2014) (quoting Fed.R.Civ.P. 8(a)(2)).  The complaint must contain a set of

---

11

12   [2] JDM alleges Defendant Will worked with JDM from early 2009 through August 2013.
13   (FAC, ¶32; *see also* FAC ¶ 33 (Defendant Will requested to be compensated on a 1099 basis
     rather than as a salaried W-2 employee)).  Defendant Will's assignment was to help with general
     sales and marketing programs of JDM as well as the development of Alpha Advisor Academy,
14   LLC ("AAA"), a sub-LLC of JDM that was formed with Defendant Will.  (FAC, ¶34).  JDM paid
     for the expenses of AAA, and AAA used the shared resources of JDM.  (*Id.*).  In his role with
15   JDM, Defendant Will had a great deal of interaction with third-party vendors often obtaining
     agreements to protect JDM trade secrets.  (FAC, ¶38).

16   [3] JDM alleges that Defendant Fine was hired by JDM in July 2010 as its Online
17   Marketing Manager, and continued in that position until July 2013 when he was promoted
     to Marketing Director, responsible for JDM's entire marketing department.  (FAC, ¶51).
18   Defendant Fine executed a 2010 Confidentiality Agreement and a March 2012 Work for
     Hire Agreement.  (FAC, ¶58 & Exhs. 1, 2).  In September 2013 Defendant Fine refused to
19   sign an updated Confidentiality and Non-Compete Agreement.  (FAC, ¶53).  On
     November 15, 2013, Defendant Fine submitted his resignation, and that date served as his
20   final day of employment at JDM.  (Id. at  ¶54).

21   [4] JDM alleges that Defendant Godinez was hired by JDM in October 2011 as a
     Creative Programming Specialist and, in 2013, was promoted to Marketing Manager,
22   responsible for supervising all employees and operations in the marketing department.
     (FAC, ¶¶ 89-90; *see also* FAC, ¶95 (Defendant Godinez held the Marketing Manager
23   position for two days)).  Defendants Fine and Uretz were among the eight or so employees
     who reported to Defendant Godinez during the time he served as Marketing Manager.  (*Id.*
24   at ¶90).  Defendant Godinez executed both a 2011 Confidentiality Agreement and a 2012
     Work for Hire Agreement.  (FAC, ¶94 & Exhs. 6, 7).  In July 2013, two days after being
25   promoted to Marketing Manager, Defendant Godinez resigned.  (FAC, ¶¶92, 95).

26   [5] JDM alleges that Defendant Uretz was hired in September 2011 as a Content
     Specialist and was later promoted to Copywriter.  (FAC,¶106).  In 2012, Uretz signed a
27   Work for Hire Agreement.  (FAC, ¶112 & Exh. 8).  In March 2013, Uretz tendered her
     resignation, but in June 2013, Godinez convinced her to return to JDM as a Copywriter.
28   (FAC, ¶¶108-109).   In July 2013 when JDM presented a new Non-Competition
     Agreement to all its employees, Defendant Uretz refused to sign the agreement which led
     to her termination.  (FAC, ¶110).

- 3 -

1    facts that serves to place the defendants on notice as to the nature and basis of the claims.

2    *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

3         "'To survive a motion to dismiss [under Fed.R.Civ.P. 12(b)(6)], a complaint must

4    contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

5    on its face;' that is, plaintiff must 'plead[ ] factual content that allows the court to draw the

6    reasonable inference that the defendant is liable for the misconduct alleged.'" *Telasaurus*

7    *VPC, LLC. v. Power,* 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556

8    U.S. 662, 678 (2009)); *see also Moss v. United States Secret Serv.,* 572 F.3d 962, 969 (9th

9    Cir. 2009) (to defeat a motion to dismiss, the "non-conclusory 'factual content,' and

10   reasonable inferences from that content, must be plausibly suggestive of a claim entitling

11   the plaintiff to relief.").  Dismissal under Rule 12(b)(6) "can be based on the lack of a

12   cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

13   theory."  *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990), *abrogated*

14   *on other grounds by Bell Atl. Corp. v. Twombly*, 530 U.S. 544 (2007).

15        "[T]he tenet that a court must accept as true all of the allegations contained in a

16   complaint..." does not apply to legal conclusions.   *Iqbal*, 556 U.S. at 678; *see also*

17   *Telasaurus*, 623 F.3d. at 1003 (pleadings that are no more than legal conclusions "'are not

18   entitled to the assumption of truth.'" (quoting *Iqbal*, 556 U.S. at 679).  Thus, "[t]hreadbare

19   recitals of the elements of a cause of action, supported by mere conclusory statements, do

20   not suffice."   *Iqbal*, 556 U.S. at 678.   Moreover, the court "cannot assume any facts

21   necessary to [the plaintiffs']...claim that they have not alleged."   *Jack Russell Terrier*

22   *Network of Northern Calif. v. American Kennel Club, Inc*., 407 F.3d 1027, 1035 (9th Cir.

23   2005).

24        However, the court will assume "'well-pleaded factual allegations,'...to be true, 'and

25   then determine whether they plausibly give rise to an entitlement to relief.'" *Telasaurus*,

26   623 F.3d. at 1003 (quoting *Iqbal*, 556 U.S. at 679); *see also Iqbal*, 556 U.S. at 678 ("A

27   claim has facial plausibility when the plaintiff pleads factual content that allows the court

28   to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Determining plausibility is a "context-specific task..." that requires the court to "draw on its judicial experience and common sense." *Id.* at 679. A complaint cannot survive dismissal where the court can only infer that a claim is merely possible rather than plausible. *Id.*

**TRADE SECRETS CLAIM AGAINST ALL MOVING DEFENDANTS (SECOND CLAIM FOR RELIEF)**

All moving Defendants contend that JDM's AUTSA claim fails to satisfy the notice pleading requirement of Rule 8 of the Federal Rules of Civil Procedure. All moving Defendants also argue that JDM fails to state a claim under the AUTSA for the following reasons: (1) JDM has failed to allege facts showing their alleged trade secrets are actually trade secrets; (2) JDM merely alleges that the individual Defendants gained "general knowledge and skills" while working at JDM and are using those skills to compete; (3) JDM fails to allege facts showing that it made reasonable efforts to maintain the secrecy of the information to which the individual Defendants had access; and (4) JDM fails to allege facts showing Defendants misappropriated the trade secrets.

"To establish a claim for misappropriation of a trade secret, the [plaintiff] must first prove a legally protectable trade secret exists. Arizona has adopted the Uniform Trade Secrets Act…, which codifies the basic principles of common law trade secret protection." *Calisi v. Unified Financial Servs., LLC.,* 232 Ariz. 103, 106, 302 P.3d 628, 631 (App. 2013). Further, the plaintiff must allege that the defendant misappropriated the trade secret through improper means. *HTS, Inc. v. Boley*, 954 F.Supp.2d 927, 943 (D.Ariz. 2013).

> Under AUTSA a "trade secret" is:
> information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

1   A.R.S. §44-401(4).  "Whether a trade secret exists is a mixed question of law and fact."

2   *Calisi*, 232 Ariz. at 106, 302 P.3d at 631.

3       AUTSA defines "misappropriation" as either:

4       (a) Acquisition of a trade secret of another by a person who knows or has
        reason to know that the trade secret was acquired by improper means.

5       (b) Disclosure or use of a trade secret of another without express or implied

6       consent by a person who either:

7           (i) Used improper means to acquire knowledge of the trade secret.

8           (ii) At the time of disclosure or use, knew or had reason to know that
            his knowledge of the trade secret was derived from or through a

9           person who had utilized improper means to acquire it, was acquired

10          under circumstances giving rise to a duty to maintain its secrecy or
            limit its use or was derived from or through a person who owed a duty

11          to the person seeking relief to maintain its secrecy or limit its use.

12          (iii) Before a material change of his position, knew or had reason to
            know that it was a trade secret and that knowledge of it had been

13          acquired by accident or mistake.

14  A.R.S. §44-401(2).  Finally, AUTSA defines "improper means" as including:

15      theft, bribery, misrepresentation, breach or inducement of a breach of a duty
        to maintain secrecy or espionage through electronic or other means.

16  A.R.S. §44-401(1).

17

18      It is well-settled that "the policy supporting trade-secret law is to balance this public

19  interest in competition in the workplace with the need for commercial ethics."  *Enterprise*

20  *Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 151, 3 P.3d 1064, 1070 (App. 2000)

21  (citing *Kenawee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481-82 (1974) (other citations

22  omitted)).

23      JDM's theory of the case is that the individual Defendants, who are JDM's former

24  employees, "devised a scheme to steal JDM's trade secrets and confidential information,

25  attempted to destroy evidence of their theft, and are now using that stolen information in a

26  competing venture." (*See e.g.* JDM's Opposition to Defendant Godinez' Partial Motion to

27  Dismiss (Doc. 38, p.2)[6]; (*see e.g.,* FAC, ¶¶ 11, 61, 75, 87, 88, 122)).  JDM contends that

28

        ---

        [6] Unless otherwise indicated, cited page numbers of the parties' filings refer to the

the FAC alleges specific and individualized facts to place all moving Defendants on notice of the claims against them.

At the outset, the Magistrate Judge addresses the issue of protection of trade secrets and economic advantage which is common to the motions filed by Defendants Will, Fine, Godinez, and Uretz.

**PROTECTION OF TRADE SECRETS.** Defendants Will, Fine, Godinez, and Uretz  argue that JDM fails to plead sufficient facts to establish that JDM took reasonable efforts to maintain the secrecy of the alleged trade secrets.  "Just as the trade secret's owner is obliged to establish that the matter is secret, it must also show that it exercised reasonable care to safeguard the secret." *Ehmke,* 197 Ariz. at 150, 3 P.3d at 1070 (citing A.R.S. § 44-401(4)(b)).  Thus, "the most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Id.*  (citation omitted).  To satisfy this requirement, the plaintiff need only "show that it made reasonable efforts to maintain the secrecy of the information such as to ensure that it would be difficult for others to discover the information without using improper means." *Id.*; *see also id.* at 197 Ariz. at 151, 144 P.3d at 1071; *Sunshine Media Group, Inc. v. Goldberg*, 2010 WL 2899081, 5 (D.Ariz. July 22, 2010) (complaint survived motion to dismiss where plaintiffs alleged that manual containing trade secretes was stamped "confidential" on each page in bold and employees were required to sign a confidentiality agreement).  Further, "the owner of a trade secret does not relinquish its secret by disclosure to employees on a necessary basis or by limited publication for a restricted purpose." *Ehmke,* 197 Ariz. at 150, 3 P.3d at 1070 (citation omitted).

In the FAC, JDM sets out "some of the security measures invoked…to protect its confidential information and trade secrets…."  (FAC, ¶30; *see also* ¶31).  Contrary to Defendants' protestations, the measures are not mere formulaic recitations but are specific to JDM.  Given that JDM has listed several measures to ensure secrecy, Defendants'

CMECF pagination at the top of the page of each document cited.

arguments that not all employees were required to sign confidentiality agreements is an argument for summary judgment, not a motion to dismiss.  JDM has sufficiently alleged that reasonable efforts have been made to keep the information secret.

**ECONOMIC ADVANTAGE.**  Defendants argue that the FAC fails to set out facts plausibly suggesting JDM derived economic value from the alleged trade secrets not being generally known to others.

> Independent economic value can be shown by "circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access." *Religious Tech. Ctr. v. Netcom On–Line Commc'n Servs., Inc.,* 923 F.Supp. 1231, 1253 (N.D.Cal.1995) (citations omitted). "[I]nformation can have independent economic value even if there is no actual product on the market utilizing the information." *Leatt Corp. v. Innovative Safety Tech., LLC,* No. 09–1301, 2010 U.S. Dist. LEXIS 37382, at *18, 2010 WL 1526382 (S.D.Cal. Apr. 15, 2010). Indeed, information can have independent economic value even if its value comes from a "negative" standpoint, such as "the results of lengthy and expensive research which proves that a certain process will not work...." *Courtesy Temp. Serv. v. Camacho*, 222 Cal.App.3d 1278, 1287, 272 Cal.Rptr. 352 (Cal.Ct.App.1990) (citation and quotations omitted).

*Spring Design, Inc. v. Barnesandnoble.com, LLC*, 2010 WL 5422556, * 5 (N.D.Cal. Dec. 27, 2010).

JDM alleges that it began developing internet based marketing and sales funnels in 2009, has expended over $30 million refining its sales funnels, and its "business advantage is derived in part from confidential and proprietary information and practice, and from trade secrets that it has developed in its long history of business[]".  (FAC, ¶¶22-24, 24(a)-24(k)).  JDM also alleges that it derives significant economic value from the fact that its confidential information and trade secrets are not known to its competitors and cannot be readily ascertained from public sources.  (FAC, ¶26).  According, to JDM its business advantage is derived, in part, from its relationships with customers and potential customers, for its agent training materials, agent support and marketing services, and its reputation with those customers and potential customers.  (FAC, ¶27).  JDM persuasively points out that the allegations in the FAC, "combined with the…fact that the Plaintiffs are businesses…, plausibly suggest that the trade secrets [at issue] have economic value."

(Doc. 38, p. 14).   JDM's allegations satisfy sufficiently allege economic advantage in support of its misappropriation claim.

**ALLEGED TRADE SECRETS.**   "A plaintiff seeking relief for misappropriation of trade secrets must describe the 'subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade.'"   *HTS Inc.,* 954 F.Supp.2d at 944 (quoting *Imax Corp. v. Cinema Tech. Inc.*, 152 F.3d 1161, 1164–65 (9th Cir.1998) (internal citations omitted)). In the FAC, JDM specifically identifies "[t]he confidential information and trade secrets regarding JDM's sales and marketing funnels…."   (*See* FAC, ¶24(a)-(k)).   The allegations include:

> Pay per click advertising designed to convert views to website visits that has been put through a rigorous compliance process developed specifically for JDM for this type of product and industry.   Pay per click advertising must create a response based upon just a few key words or phrases.

 (FAC, ¶24(a));

> Knowing when and where to use pay per click advertising to increase consumer response and decrease advertising costs.   Incredible amounts of money can be wasted by advertising at the wrong place or time.   Knowing what words, word combinations, phrases, titles, topics on what websites or combination of websites at different times of the day, week, or month is critical.   This has taken JDM years to develop at tremendous expense—JDM has spent over $30 million on such advertising.

(FAC, ¶24(b));

> E-mails designed to convert to website visits that have been put through a rigorous compliance process developed specifically for this type of product and industry.   Development includes knowing what copy to use in the subject line, what headlines to use, what copy to use for the body of the e-mail, and what calls to action to sue [sic].   If any one of these factors is missing or "off", then the entire e-mail may be ineffective.   Development also includes knowing what topics to use relative to current events and how to blend different topics for best response.

(FAC, ¶24(c));

> Knowing when and where to use e-mail advertising to increase consumer response and decrease advertising costs.   E-mails must be sent to the right demographics, at the right time (relative to time of day, current events, and days of the week also taking into account holidays).   This has also taken years to develop at great expense.

(FAC, ¶24(d));

> Website landing pages [of which]…[c]ritical components include specific words, phrases, titles, topics, and videos as well as almost innumerable combinations of them.  Each component has been tested and tracked to determine what gets the best response from consumers taking into account variables such at [sic] what e-mails and pay per click ads they are used in conjunction with.

(FAC, 24(e));

> …Call center staffing and activity [which] must be closely coordinated to current advertising volume and message.  All aspects of call center performance have been tracked and measured to improve performance including call response times, time of day, clients called, number of clients called, number of times clients called, frequency of client calls, coordinating client calls with e-mails and timing of appointments set.

(FAC, ¶24(f));

> Training for financial advisors that teaches them JDM's sales process, including specific messaging for each appointment with the client.  Critical aspects include what to say to clients under different circumstances, at what stage in the sale process to introduce different concepts, income planning to maximize value to the client, and the psychology of annuity buyers.

(FAC, ¶24(j); *see also* FAC, ¶¶24(g)-(h) and (k) (regarding sales processes and training techniques)).

Defendants Will, Fine, Godinez, and Uretz take issue with the fact that JDM combines reference to "confidential information and trade secrets" in the same allegation, asserting that that the FAC fails to put them on notice as to what the actual trade secrets are that they are alleged to have misappropriated.  However, as discussed below, JDM does not rely on paragraph 24 and its sub-parts, alone, to identify the trade secrets that Defendants Will, Fine, Godinez and Uretz are alleged to have misappropriated.  Instead, JDM asserts that Defendants Will, Fine, Godinez, and Uretz misappropriated the physical manifestations of trade secrets.  Because the information that each of the individual moving defendants is alleged to have misappropriated is, for the most part, unique to the individual, the Magistrate Judge discusses each motion to dismiss the AUTSA claim separately with regard to the each of the moving Defendants.

**DEFENDANTS WILL AND FINE'S MOTION TO DISMISS AUTSA CLAIM.**  At the outset, Defendants Will and Fine contend that "[a]s a matter of law" websites, website design, internet advertising, and keywords cannot be considered trade secrets.  (Doc. 36, p. 3

(citing *Wyatt Technology Corp. v. Malvern Instruments, Inc.*, 2009 WL 2365647, *21 (C.D. Cal. Sept. 30, 2012), *aff'd* 526 Fed.Appx. 761 (9th Cir. 2013)).  However, *Wyatt* was decided on summary judgment and the court relied on affidavits to conclude that "relevant search terms of the…industry and other keywords are publicly disclosed and publicly accessible."  *Wyatt Technology Corp.*, 2009 WL 2365647 at *21 (citing affidavits for conclusion that website is public, keywords are publicly accessible, and other competitors use the same phrasing on their websites).  Defendants Will and Fine assert that "[t]he Court may take judicial notice…that the so-called 'secrets' to successful pay per click and e-mail advertising and website landing pages, are readily available to anyone who enters those very terms in a 'Google' search."  (Doc. 29, p. 3 n.2)  At best, Defendants' arguments on this issue are premature at this stage in the litigation.

JDM asserts in its Opposition to Defendant Will and Fine's Motion that the allegations are "not that Defendants have simply misappropriated the ideas or secrets behind Plaintiffs' various trade secrets, but that Defendants have systematically and wrongfully misappropriated the physical manifestations of Plaintiffs' trade secrets." (JDM's Opposition to Defendant Will and Fine's Motion (Doc. 29, p. 4) (citing FAC, ¶¶24-27, 39, 55-58, 61, 64, 69, 75, 96, 114, 115,117, 119, 121)).[7]

As to Defendant Will, JDM alleges that he "had access to" confidential client and marketing lists and access to the confidential client/agent list of Advisor Excel, which is a product partner/vender to JDM (FAC, ¶39; *see also* FAC, ¶38), hosted an unauthorized webinar using JDM proprietary materials, (FAC, ¶¶47, 48), and post-employment with JDM, gained unauthorized access to "JDM web domains and, with that access secured, in November, 2013…illegally downloaded the content of those sites, including all of JDM's training and educational videos[]" (FAC, ¶¶121-120).  JDM stresses, "at the pleading stage, what matters is that it is 'plausible on its face' that these items constitute protectable trade secrets."  (Doc. 29, p. 4).  This Court agrees.  "[A] trade secret may consist of a

---

[7] The Court omits citation to allegations concerning defendants who have not been served.

compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Ehmke*, 197 Ariz. at 148, 151, 3 P.3d at 1068 (holding car rental company's worksheet, reflecting substantial market-research investment by plaintiff delineating factors helpful to managing a successful branch office, "as a whole is an original product containing an arrangement of factors that provides [plaintiff] a competitive advantage" unique to the plaintiff); *see also Prudential Ins. Co. v. Pochiro,* 153 Ariz. 368, 371, 736 P.2d 1180, 1183 (App. 1987) ("'A list of customers, if their trade and patronage have been secured by years of business effort and advertising and the expenditure of time and money, constitutes an important part of a business and is in the nature of a trade secret.'") (quoting *Town & Country House & Homes Service, Inc. v. Evans*, 150 Conn. 314, 319, 189 A.2d 390, 393–394 (1963)); *Amex Distributing Co., Inc. v. Mascari,* 150 Ariz. 510, 516, 724 P.2d 596, 602 (1986) ("[i]f customer information is truly confidential, and to a substantial degree inaccessible, it may be given a measure of the protection accorded true trade secrets…."). The allegations set out in the FAC place Defendant Will on notice of the claim asserted against him and sets forth sufficient facts to support JDM's claim that trade secrets are at issue.

JDM also alleges that Defendant Fine misappropriated physical manifestations of JDM's trade secrets. (Doc. 29, pp. 4, 11-12). JDM alleges that before leaving JDM's employ, Defendant Fine "caused a forensic wipe of the hard drive on his JDM-assigned desktop computer to occur." (FAC, ¶55). As a result of the thoroughness of the hard wipe, no data can be recovered from the computer and "the body of work Defendant Fine had performed for JDM over the last three (3) plus-years was largely destroyed, including spreadsheets that documented the relative cost-effectiveness and profitability of all of JDM's historical ADWords marketing, including information such as cost per click, cost per lead conversion, cost per appointment, average size of policy generated, revenue per key word per marketing channel, and profit per key work [sic] per marketing channel." (*Id.*; *see also* FAC, ¶¶56-58 (Defendant Fine also caused a wipe of a secondary hard drive

on his JDM desktop computer and his JDM assigned notebook computer)).   JDM alleges
that "prior to wiping the data, Fine misappropriated [JDM's]…trade secrets, including but
not limited to its Internet advertising data, so that he could use these trade secrets in
conjunction with his planned new competing business venture [sic] Defendants Will and
Impact."   (FAC, ¶61 *see also* FAC, ¶¶64-65)).   JDM also alleges that Defendant Fine
"caused some or the entire work product that he had performed for JDM to be transferred
to Defendants Impact and Will and is using such proprietary work product and trade secret
information in his current work with Defendant Impact."  (FAC, ¶75).

          At oral argument, counsel for JDM explained that the information destroyed by
Defendant Fine's wipe of JDM's hard drives, and the information that JDM alleges
Defendant Fine is using in his new venture is based on data collected over the years by
JDM and that such data show which leads actually work and how they work and what has
been most effective most of the time, and that this information constitute trade secrets.  The
FAC supports this assertion.  *See* FAC, ¶¶22-23 (JDM began developing internet based
marketing and sales funnels in 2009 and, to date, has expended in excess of $30 million
refining its sales funnels); FAC, ¶24 (describing knowledge JDM has "developed in its
long history of business."); FAC, ¶1 (JDM has operated since 2004 in its current area)).
JDM has sufficiently alleged facts that support a claim that the information Defendant Fine
allegedly misappropriated constitutes trade secrets.   *See e.g. W.L. Gore & Assocs., Inc. v.
GI Dynamics, Inc.*, 2010 WL 5184254, *8 (D. Ariz. 2010) (declining to dismiss allegation
that information plaintiff "disclosed about…[]approaches that were successful and
approaches that were not successful…[]" in product development constituted trade secrets);
*Ehmke,* 197 Ariz. at 150, 3 P.3d at 1070 (trade secret protection can extend to "market
research").  The allegations set out in the FAC place Defendant Fine on notice of the claim
asserted against him and sets forth sufficient facts to support JDM's claim that trade secrets
are at issue.

GENERAL KNOWLEDGE.  Defendants Will and Fine argue that even if JDM's AUTSA claim
satisfies Rule 8 pleading requirements, "that count must still be dismissed because the facts

alleged show nothing more than that Moving Defendants gained skills and general knowledge from Plaintiffs concerning internet-based marketing and used that knowledge to subsequently compete with Plaintiffs."  (Doc. 23, p.5 (citing *HTS Inc.,* 954 F.Supp. 2d at 944) (the claim must describe the 'subject matter of the trade secret with specific particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons…skilled in the trade.")).

"Under Arizona law, 'matters of general knowledge cannot be appropriated as secret, [however,] a trade secret may consist of a combination of elements even though each individual component may be a matter of common knowledge.'" *HTS, Inc.,* 954 F.Supp.2d at 944 (quoting *Imax Corp.,* 152 F.3d at 1069).  Further, "'[a] former agent may use skills and more general knowledge, although learned in the course of work done for the former principal,' in the course of competition." *Taser Int'l., Inc. v. Ward,* 224 Ariz. 389, 397, 231 P.3d 921, 929 (App. 2010) (quoting *Restatement* 3d Agency § 804 cmt. c (2006)) (denying summary judgment because dispute of fact existed as to whether defendant used trade secret information); *see also Mascari,* 150 Ariz. at 516, 724 P.2d at 602 ("One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience.  These skills are valuable to such employee in the market place for his services.").

JDM asserts that the individual Defendants misappropriated "the physical manifestations of Plaintiffs' trade secrets[]".  (Doc. 29**,** p. 11).  JDM points to its allegations identifying specific information misappropriated by Defendants' Will and Fine which is discussed in detail above.

There is no question that information that "encompasses basic general principles for the aggressive pursuit of success in a highly competitive field of business….The essentials of these (know the customer, be constantly aware of his concerns, keep in regular frequent contact, limit conversations to relevant business, etc.), are clearly in the public domain[]" and do not qualify as trade secrets. *Mascari,* 150 Ariz. at 516, 724 P.2d at 516.  There is simply no basis to believe that the information that Defendants Will and Fine are alleged to

have misappropriated, which includes client lists, training information, or data reflecting effectiveness of methods and strategies for internet advertising or calls, or other marketing all unique to JDM are general knowledge.   To the contrary, JDM alleges that the information that Defendants Will and Fine misappropriated was arrived at after JDM's years of development of data related to sales and marketing funnels.   The allegations in the FAC plausibly suggest that the information at issue is not mere general knowledge but was derived after analysis and compilation of data by JDM.   *See e.g. Ehmke,* 197 Ariz. at 150, 3 P.3d at 1070 (trade secret protection can extend to "market research"); *Prudential Ins. Co.,* 153 Ariz. at 371, 736 P.2d at 1183 (trade secret protection can extend to client lists) *Mascari,* 150 Ariz. at 516, 724 P.2d at 602 (same).   Indeed, as JDM persuasively point out, "if Defendants [Will and Fine] were merely misappropriating general skills and knowledge then they presumably would not have needed to go to the lengths they did to steal the physical embodiments of Plaintiffs' trade secrets."   (Doc. 29, p. 12).   Dismissal on the issue of whether the information is mere general knowledge is not appropriate at this stage in the proceeding.

*MISAPPROPRIATION.*   Defendants Will and Fine argue for the first time in their Reply that JDM's allegations fail to meet the statutory definition of misappropriation.   (Defendant Will and Fine's Reply (Doc. 36, p. 4)).   Defendants assert, and the Magistrate Judge agrees, that Defendant Will having "access" to client lists, or Defendant Fine taking internet advertising data so "he could use it" in a planned new competing venture, and even Defendant Fine's forensic wipe of JDM hard drives, may not necessarily constitute misappropriation.   *Id.* at pp. 4-5 (citing *Pellerin v. Honeywell Int'l Inc.,* 877 F.Supp.2d 983, 989 (S.D. Cal. 2012) (allegation that defendant had access to and acquired plaintiff's trade secret information is insufficient to establish misappropriation); *Eletronic Planroom, Inc. v. The McGraw-Hill Companies, Inc.,* 135 F.Supp.2d 805, (E.D. Mich. 2001) (on summary judgment, defendant's deletion and copying of trade secret information, alone, is not enough; defendant must have actually used this information)).   In *Pellerin,* the court dismissed a counterclaim of misappropriation of trade secrets where the counterclaimant

failed to allege any facts in support of a legal conclusion that plaintiffs "'used and/or disclosed' and 'acquired and/or used' [counterclaimant's] trade secrets or confidential information." *Pellerin,* 877 F.Supp.2d at 990.

Here, the FAC alleges that Defendant Fine, prior to deleting the information, misappropriated JDM's trade secrets, including but not limited to marketing data, so that he could use these trade secrets in conjunction with a competing business venture with Defendants Will and Impact Partnerhsip. (FAC, ¶61). Further, JDM learned in February 2014 "that Defendants Will and Fine had associated themselves with Defendant Impact and that Defendant Impact was in the process of launching an Internet marketing portal for insurance and annuity agents that would compete directly with JDM's Internet marketing portal." (FAC, ¶62). JDM also alleges that Defendant Will approached Defendant "Impact Partnership to launch a web-based lead program that mirrors the JDM program and that clients and agents of Advisors Excel have received marketing regarding the lead program. JDM's internal advisors also received this marketing." (FAC, ¶122). Further, "Defendant Will launched several websites very similar to JDM sites…." (FAC, ¶124) and one of his websites "is purchasing AdWords and keywords identical in name, pattern, and volume to the purchases conducted by Defendant Fine in his former role as Marketing Director at JDM." (FAC, ¶126). The allegations plausibly suggest that Defendants Will and Fine not only had access to trade secret information, but that they have acquired that information and are using it as well. Consequently, JDM has sufficiently alleged misappropriation by Defendants Will and Fine.

CONCLUSION. Defendant Will and Fine's motion to dismiss the AUTSA claim should be denied.

**DEFENDANT GODINEZ' MOTION TO DISMISS AUTSA CLAIM**. JDM alleges that during Defendant Godinez' tenure as Creative Programming Specialist and later, during his 2-day stint as Marketing Manager, he "had access to confidential and proprietary information" and "was responsible for overseeing the design and implementation of advertising campaigns and media buys. He was responsible for measuring the effectiveness of money

spent on advertising per campaign and tracked all consumer response and lead flow. Defendant Godinez' responsibilities were such that he had oversight of some of the most critical and proprietary information relative to JDM's marketing and sales funnels." (FAC, ¶93). JDM links Defendant Godinez to Defendant Will by alleging that while both were at JDM, they "worked together using JDM resources during work hours on websites similar to those of JDM to attract other insurance clients" and Defendant Godinez contacted JDM's advertising vendors to assist in this effort, which resulted in Defendants Will and Godinez "launching competing websites and competing advertising." (FAC, ¶98 (identifying competing websites allegedly developed by Defendants Godinez and Will)). JDM alleges that while still employed at JDM, Defendant Godinez made proactive efforts to conceal and destroy evidence of wrongdoing on behalf of Defendant Will and also deleted numerous files from his own computer to hide his misconduct. (FAC, ¶¶ 99-100). JDM further alleges that after leaving JDM's employment, Defendant Godinez "has collaborated with Defendants Will, Fine, Arceo and Uretz to copy JDM's sales and marketing programs." (FAC, ¶96).

To state a claim for misappropriation of trade secrets, courts have found sufficient allegations that a defendant misappropriated strategies and plans for advertising and marketing. *See e.g. Lepton Labs, LLC v. Walker*, __ F.Supp.3d ___, 2014 WL 4826164, *4 (C.D. Cal. Sept. 23, 2014); *Fire 'Em Up, Inc. v. Technocarb Equip. (2004) Lts.,* 799 F.Supp.2d 846, 850 (N.D. Ill. 2011) (citations omitted) (holding same but ultimately dismissing claim because, on the facts of that case, plaintiff failed to sufficiently allege that the secrecy of the information was adequately maintained). Such a conclusion is consistent with the *Ehmke* court's holding that trade secret protection extends to sensitive internal economic records. *See Ehmke,* 197 Ariz. at 149-150, 3 P.3d at 1070. Thus, the allegations set out in the FAC place Defendant Godinez on notice of the claim asserted against him and sets forth sufficient facts to support JDM's claim that trade secrets are at issue.

Defendant Godinez challenges the plausibility of the allegations against him by taking issue with JDM's assertions that he concealed and destroyed evidence of Defendant

Will's wrongdoing and notified Defendant Will of JDM's investigation of Defendant Will's actions.  Defendant Godinez points out that he resigned from JDM in July 2013 (FAC, ¶¶49-50) and Defendant Will's wrongdoing occurred after July 19, 2013 and, in some instances, was not discovered until January and February 2014.  (Defendant Godinez' Reply (Doc. 40, p. 3)).  The precise date in July 2013 Defendant Godinez resigned is not alleged in the FAC.  Further, the date in July 2013 that Defendant Will hosted an unauthorized webinar is not alleged.  Nonetheless, most germane to JDM's claim linking Defendants Godinez' and Will's post-JDM employment efforts together is, that while at JDM they worked together using JDM resources to create ventures that competed against JDM.  (*See* FAC, ¶ 97).  At bottom, the allegations at paragraph 97 nudge "across the line from conceivable to plausible", *Iqbal,* 556 U.S. at 680, the allegation  that the two continued to collaborate in competing with JDM after leaving JDM's employment.

*MISAPPROPRIATION*.  JDM's claim is lacking, however, in establishing misappropriation by Defendant Godinez.  Although JDM alleges that Defendant Will "had approached The Impact Partnership to launch a web-based lead program that mirrors the JDM program…", marketed same to clients and agents of Advisors Excel, launched his own websites similar to JDM, and purchased AdWords and keywords identical in name, pattern, and volume to the purchases made by Defendant Fine while at JDM (FAC, ¶¶ 122, 124, 126), JDM's allegations make no suggestion that any trade secret information obtained from Defendant Godinez after he left JDM's employment played a role in any of this.  Instead, the allegations plausibly suggest that in his actions alleged at paragraphs 122, 124 and 126, Defendant Will relied on such information as client lists, to which JDM alleges he had access, and to information obtained from Defendant Fine.  Because JDM fails to allege facts supporting the allegation in paragraph 96 that Defendant Godinez actually misappropriated any trade secrets, including sales and marketing programs, in collaboration with the individual Defendants, JDM's AUTSA claim against Defendant Godinez should be dismissed for failure to state a claim.

*Conclusion.*  Defendant Godinez' motion to dismiss the AUTSA claim for failure to

state a claim should be granted.

**DEFENDANT URETZ' MOTION TO DISMISS AUTSA CLAIM.** JDM alleges that Defendant Uretz, as a Copywriter, was responsible for developing content for all advertising and that during her tenure at JDM, she "had exposure and access to…some of the most critical and proprietary information relative to JDM's marketing and sales funnels." (FAC, ¶¶ 107, 111;*see also* FAC, ¶107 ("While the copy that Defendant Uretz developed appeared in the public domain, the measured effectiveness of the copy is confidential and proprietary information.").  After Defendant Uretz' termination, for refusal to sign a non-compete agreement, JDM alleges that it discovered that Defendant Uretz "had sent confidential and proprietary materials from her JDM email to her personal email account prior to her termination."  (FAC, ¶115).  The information Defendant Uretz emailed to her personal account "included ongoing work projects, documentation of the JDM advisor recruiting process and initial contact letter, contact information and pricing for third party vendors, non-public advertising copy still in development, and advertising copy associated with third party vendors[]" and there was no business justification for sending herself this information. (FAC, ¶115; *see also* FAC, ¶116 (valuing such information in excess of $1 million)).  JDM alleges that Defendant Uretz has collaborated with the other individual Defendants "to copy JDM's sales and marketing programs."  (FAC, ¶117).  JDM also alleges that it has "learned from its current clients that Defendant Uretz, in conjunction with Defendant Fine, has been contacting JDM clients in an effort to recruit them to Impact Partnership."  (FAC, ¶118).

The allegations at paragraph 115 sufficiently place Defendant Uretz on notice as to what information she is alleged to have misappropriated.  However, even assuming that all or some of the information Defendant Uretz emailed herself constitute trade secrets, there are no allegations to support the conclusion that Defendant Uretz has used or disclosed that information.  The allegations that at some point during her two-year tenure at JDM that she emailed information to her personal account, and post-JDM employment, she associated herself with Defendant Impact Partnership do not plausibly support the

conclusion that she collaborated with others to copy JDM's sales and marketing programs. Furthermore, although JDM alleges that Defendant Uretz, in her association with Defendant Impact Partnership, has contacted JDM clients, there is no allegation that she misappropriated JDM's client lists.    JDM's allegations that Defendant Uretz misappropriated trade secrets are insufficient to raise JDM's right to relief under AUTSA above the speculative level.  Consequently, JDM's AUTSA claim against Defendant Uretz should be dismissed for failure to state a claim.

*CONCLUSION*. Defendant Uretz' motion to dismiss the AUTSA claim for failure to state a claim should be granted.

**DEFENDANT IMPACT PARTNERSHIP'S MOTION TO DISMISS AUTSA CLAIM.**  The parties agree that JDM must allege facts supporting the conclusion that  Defendant Impact Partnership knew or had reason to know that it was using trade secrets acquired by improper means.  (*See* Defendant Impact Partnership's Motion to Dismiss (Doc. 27, p. 4) (citing A.R.S. §44-401(2)(b)(ii)); JDM's Opposition to Defendant Impact Partnership's Motion to Dismiss (Doc. 33, p. 8)).

Many of the allegations involving Defendant Impact Partnership appear in the portion of the FAC captioned "Defendant Fine's Misconduct".   JDM alleges that Defendants Fine and Will "associated themselves with Defendant Impact Partnership and that Defendant Impact was in the process of launching an Internet marketing portal for insurance and annuity agents that would compete directly with JDM's Internet marketing portal."  (FAC, ¶62).  In the next paragraph, JDM refers to "*Defendants*' competing www.annuityangel.com website" which purchased AdWords and keywords identical in nature, pattern, and volume to the purchases conducted by Defendant Fine in his former role as Marketing Director at JDM  (FAC, ¶63) (emphasis added); however elsewhere in the FAC, JDM alleges that it was Defendant Will who launched that particular website and makes no reference to Defendant Impact Partnership.  (*See* FAC, ¶124).  In outlining Defendant Fine's misconduct, JDM next alleges that "Defendants had formed a new Georgia limited liability company, JFI, LLC ("JFI"), that was upon information and belief,

created to market and promote their Internet marketing portal for insurance and annuity agents to be based on JDM's stolen trade secrets, including data removed from the JDM computer hard drive that Defendant Fine subsequently caused to be destroyed."  (FAC, ¶64).  It is not clear which Defendants, other than perhaps Defendant Fine since the allegation is in a section detailing his alleged misconduct, created JFI.  As Defendant Impact Partnership points out, there is no allegation that The Impact Partnership is a member of JFI, LLC, or has any role whatsoever in managing it.  (Defendant Impact Partnership's Reply, (Doc. 37, p.5)).  In deciding a motion to dismiss, the court is not permitted to assume any facts necessary to the plaintiff's claim that the plaintiff has not alleged. *American Kennel Club, Inc.,* 407 F.3d at 1035.

Defendant Impact Partnership persuasively points out that while, at best, JDM's allegations are that the individual defendants in the course of their work with Defendant Impact Partnership used trade secret information, there are no facts showing that Defendant Impact Partnership had any knowledge whatsoever regarding the information purportedly used.  (*See* Doc. 37, p. 5 n.5; *see also id.* at p. 5 ("Plaintiffs rely on their allegations that *other defendants* misappropriated trade secrets and are now working with The Impact Partnership….)) (emphasis in original).  JDM cites *Morlife, Inc. v. Perry,* 56 Cal.App.4[th] 1516, 66 Cal.Rptr.2d 731 (1977) for the premise that former employees and "corporate entity they joined to compete with former employer…'jointly misappropriated' [the plaintiff's] customer list by using their knowledge about [the plaintiff's] customers to actively 'solicit' customers for [the corporate entity.]'"  (Doc. 33, p. 10 (quoting *Morlife,* 56 Cal.App. at 1523-24)).  In *Morlife,* the defendant employees *formed* the competing business with another person and then used the former employer's customer list to solicit customers.  Here, there are no similar allegations with regard to the individual Defendants and Defendant Impact Partnership.

While it is conceivable that Defendant Impact Partnership may know or have reason to know that the information that Defendants Arceo, Will and Fine allegedly have used to the benefit of Defendant Impact Partnership constitutes JDM trade secrets, the allegations

of the FAC, without more, fail to nudge JDM's claim of AUTSA violation "'across the line from conceivable to plausible.'"   *Somers v. Apple,* 729 F.3d 953, 966 (9th Cir. 2013) (quoting *Iqbal,* 556 U.S. at 570); *see e.g. Forest Labs., Inc. v. Pillsbury Co.,* 452 F.2d 621, 626 (7th Cir. 1971) (the knowledge of trade secrets of former employees "cannot properly be imputed to [corporation that purchased employees' former corporation] just because they went to work for…" the purchasing corporation).  JDM fails to state an AUTSA claim against Defendant Impact Partnership.

*Conclusion.*   Defendant Impact Partnership's motion to dismiss the AUTSA claim for failure to state a claim should be granted.

**UNFAIR COMPETITION ALLEGED AGAINST ALL MOVING DEFENDANTS (THIRD CLAIM FOR RELIEF)**

JDM alleges, *inter alia,* that all Defendants "have engaged in unlawful business acts or practices by committing acts including computer fraud, trespass, conversion, and other illegal acts and practices as alleged above [*i.e.* AUTSA claim]…", in effort to gain unfair competitive advantage over JDM.   (FAC, ¶147).   Defendants primarily raise two challenges to JDM"s claim:  first that the claim is pre-empted by AUTSA; and second, that JDM fails to allege public confusion.

As to pre-emption, AUTSA "creates an exclusive cause of action—and displaces conflicting causes of action—for claims based on the misappropriation of trade secrets." *Orca Commc'ns. Unlimited, LLC v. Noder,* 236 Ariz. 180, __, 337 P.3d 545, 546 (2014) (*Orca II*).  After briefing and oral argument occurred on the pending motions, the Arizona Supreme Court held that AUTSA "does not displace common-law claims based on alleged misappropriation of confidential information that is not a trade secret."   *Id.*   The court, which was reviewing the lower courts' decision on a motion to dismiss, declined to "decide today what aspects, if any, of the confidential information alleged in [the plaintiff's] unfair-competition claim might fall within AUTSA's broad definition of 'trade secret' and therefore be displaced….That determination will not hinge on the claim's label, but rather will depend on discovery and further litigation that has not yet occurred."   *Id.* at __, 337

P.3d at 549 (citations omitted).   The court also declined to decide whether Arizona

recognizes a common-law claim for unfair competition as alleged in the complaint.   *Id.*   In

light of *Orca II,* it cannot be said at this point in the litigation that JDM's claim is pre-

empted by AUTSA to the extent it may involve confidential information that are not trade

secrets.

The next question is whether JDM must allege public confusion to state an unfair

competition claim.   "In order to maintain an action for unfair competition under Arizona

law, [the plaintiff] must either show that it was engaged in competitive business with [the

defendant]   *Lininger v. Desert Lodge,* 63 Ariz. 239, 160 P.2d 761, 764 (1945), or that [the

defendant's] actions were likely to produce public confusion, *Taylor v. Quebedeaux,* 126

Ariz. 515, 617 P.2d 23, 24 (1980)."   *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,*

971 F.2d 401, 407 (9th Cir.1992).   The District Court for the District of Arizona has

observed that:

> The Arizona Court of Appeals has held that the common law doctrine of
> unfair competition "encompasses several tort theories, such as trademark
> infringement, false advertising, 'palming off,' and misappropriation."
> *Fairway Constructors, Inc. v. Ahern,* 193 Ariz. 122, 970 P.2d 954, 956
> (Ariz.Ct.App.1998) (citing W. Page Keeton et al., *Prosser and Keeton on the
> Law of Torts* § 130 (5th ed.1984)). "[T]he central tort in unfair competition at
> common law is known as 'palming off,' or 'passing off [sic] It consists in a
> false representation tending to induce buyers to believe that the defendant's
> product is that of the plaintiff ..." *Id.* Moreover, while collecting opinions and
> noting that "no inflexible rule can be stated as to what conduct will constitute
> unfair competition," the Arizona Supreme Court held, "The universal test is
> whether the public is likely to be confused." *Boice v. Stevenson,* 66 Ariz.
> 308, 187 P.2d 648, 653 (Ariz.1947)[8]; *see also Sutter Home Winery, Inc. v.
> Vintage Selections, Ltd.,* 971 F.2d 401, 407 (9th Cir.1992) (explaining that,
> under Arizona law, an action for unfair competition requires the plaintiff to
> show either "that it was engaged in competitive business" with the defendant
> or that the defendant's actions "were likely to produce public confusion"
> (citations omitted)).

*Doe v. Arizona Hosp. and Healthcare Assoc.,* 2009 WL 1423378, *11 (D.Ariz. Mar. 19,

2009).   The *Doe* court dismissed a claim of unfair competition where the plaintiff failed to

---

[8] *Boice* involved a claim of unfair competition between similarly named businesses.

allege that the defendant's actions were likely to cause public confusion because no Arizona case has ever held that the tort of unfair competition can exist in the absence of an allegation of public confusion.  *Id.*  The court went on to state that plaintiffs, whose main theory of unfair competition was based on alleged antitrust activity, did not "allege trademark infringement, false advertising, palming off, misappropriation, or any other actions that have been found to constitute unfair competition[]" in Aizona.  *Id.*  The court was "unwilling to find that Plaintiffs may maintain a theory of unfair competition that is entirely novel in Arizona."  *Id.*;  *See also Act Group, Inc. v. Hamlin,* 2012 WL 2976724, *8 (D. Ariz. July 20, 2012) (declining to entertain a theory of unfair competition that is novel to Arizona) (citing *Doe,* 2009 Ariz. 1423378).

At oral argument, JDM conceded that the fundamental nature of its unfair competition does not rest upon a theory of public confusion.  Instead, JDM argues that the allegation that JDM is engaged in competitive business with the Defendants is enough to state a claim.  (*See* Doc. 29, p. 14).

*Act Group,* is particularly instructive.  In that case, the court held that the plaintiff failed to establish unfair competition based on a theory of palming off because the plaintiff failed to allege public confusion.  2012 WL 2976724 at * 7.  However, despite the lacking allegations of public confusion, the court went on to hold that the plaintiff would have stated a claim of unfair competition based upon misappropriation but that the claim was pre-empted by federal copyright law.  *Id.* at *7-*8.  The *Act Group* court's analysis is consistent with the conclusion that an unfair competition claim must either show that the plaintiff was engaged in competitive business with the defendant or that the defendant's actions were likely to produce public confusion.  *See Sutter Home Winery, Inc.* 971 F.2d at 407.

Moreover, the Arizona Supreme Court recently declined to dismiss a claim of unfair competition based on AUTSA pre-emption where the plaintiff alleged that

[the defendant employee] had 'learned confidential and trade secret information about [the plaintiff]', including 'information about [plaintiff's] business model, operating procedures, techniques, and strengths and

1
2

weaknesses.'  [Plaintiff] further alleged that [defendant] intended to 'steal[]' and 'exploit' that information and [plaintiff's] customers to gain a competitive advantage for her company.

3
4
5
6

*Orca II,* 236 Ariz. at __, 337 P.3d at 546.  However, the court emphasized that its decision was confined to the pre-emption issue and it declined to "decide whether Arizona recognizes a common-law claim for unfair competition as alleged in [the plaintiff's] complaint." *Id.* 236 Ariz. at __, 337 P.3d at 549.

7
8
9
10
11
12
13
14
15

"The common law doctrine of 'misappropriation' originated in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). *Balboa* [Ins. *Co. v. Trans Global Equities*, 218 Cal.App.3d 1327, 267 Cal.Rptr. 787, 795(1990)].  'It is normally invoked in an effort to protect something of value that is not covered either by patent or copyright law....' *Id.* (citations omitted). Misappropriation involves the unfair taking for profit, at little or no cost, of property acquired by another through investment of substantial time and money. *Id.*"  *Fairway Constructors, Inc. v. Ahern,* 193 Ariz. 122, 124, 970 P.2d 954, 956 (App. 1998) (holding that unfair competition claim based on misappropriation was pre-empted by federal copyright law).

16
17
18
19
20
21
22
23
24
25
26
27
28

The doctrine of "unfair competition is based on principles of equity....The general purpose of the doctrine is to prevent business conduct that is contrary to honest practice in industrial or commercial matters." *Id.* (internal quotation marks and citations omitted).  In the instant case, any claim of misappropriation of trade secrets is clearly pre-empted by AUTSA.  *See Orca II,* 236 Ariz. at __ , 337 P.3d at 545. Otherwise, JDM's allegations in general are strikingly similar in concept to those alleged by the plaintiff in *Orca II*. However,  JDM has not specifically alleged in stating its unfair competition claim that Defendants misappropriated information that falls outside AUTSA's coverage.  As to JDM's claims of unfair competition based on conversion and trespass by Defendant Fine (*see* Eighth and Ninth Claims), and computer fraud by Defendants Will and Fine (*see* First Claim), this Court, like the courts in *Doe* and *Act Group,* should be reluctant to allow theories of unfair competition that are novel to Arizona.  Consequently, JDM's claim for unfair competition should be dismissed for failure to state a claim.

**BREACH OF CONTRACT CLAIM ALLEGED AGAINST MOVING DEFENDANTS FINE AND GODINEZ (FOURTH CLAIM FOR RELIEF)**

JDM alleges that Defendants Fine and Godinez, in exchange for adequate consideration, entered into respective Confidentiality Agreements ("Agreement") wherein they agreed not to:

> []disclose Confidential Information, directly or indirectly, under any circumstances, or by any means, to any third person without the express written consent of the Company[]

or

> copy, transmit, reproduce, summarize, quote, or make any commercial or other use whatsoever of Confidential Information, except as may be necessary to perform [their] duties for the Company.

(FAC, ¶¶157, 158; *see also* FAC, Exh. 1, §§5, 6 (Defendant Fine's Agreement) & Exh. 6, §§5, 6 (Defendant Godinez' agreement)).    Under the Agreement, "Confidential Information" is defined to include:

> (a) proprietary information of the Company, (b) information marked or designated by the Company as confidential, (c) information, whether or not in written form and whether or not designated as confidential, that is known to me as being treated by the Company as confidential; and (d) information provided to the Company by third parties that the Company is obligated to keep confidential.  Confidential Information includes, but is not limited to, client lists, financial information related to client accounts, discoveries, documentation, processes, know-how, marketing plans, and other financial and technical information.

(FAC, Exh. 1, §1 & Exh. 6, §1).  Further, the Agreement specifically states that it shall not apply to any information that JDM voluntarily makes public or that otherwise becomes part of the public domain through lawful means.  (FAC, Exh. 1, §8; FAC, Exh. 6, §8).    Defendants' obligations under the Agreement "will continue beyond the termination of [their] business relationship with [JDM] and for as long as [they] possess Confidential Information."  (FAC, Exh. 1, §11; FAC, Exh. 6, §11).

Defendants Fine and Godinez argue that the Agreement is unenforceable.  (Doc. 23, pp. 9-10; Doc. 36, pp. 9-10; Doc. 32, pp. 11-13; Doc. 40, pp. 7-11).  They also argue that JDM fails to allege facts to state a claim for breach of contract.

1   **ENFORCEABILITY.**   In Arizona, an overly broad confidentiality agreement amounts to a

2   noncompetition agreement.  *See Orca Commc'ns. Unlimited, LLC v. Noder,* 233 Ariz. 411,

3   417, 314 P.3d 89, 95 (App. 2013), *depublished in part on other grounds, Orca II,* 296 Ariz.

4   at __, 337 P.3d at 550 (depublishing ¶¶ 28-31).  In turn, a noncompetition agreement must

5   be limited in time and in geography.  *Id.*  Thus, Defendants' argument is that because the

6   definition of Confidential Information in the Agreement is overly broad, it must be treated

7   as a noncompetition agreement, which in this case would be unenforceable because it is not

8   restricted in time or geography.  (*See* FAC, Exh. 1 §11; FAC, Exh. 6, §11 (duration

9   clause)).

10   Defendants argue that the Agreement is over broad because it includes information

11   that is not truly confidential such as "discoveries, documentation, processes and know-

12   how."  (*See* Doc. 36, pp. 9-10; *see also* Doc. 40, pp.7-9).  According to Defendants, the

13   Agreement prevents them from using public information and information they learned from

14   employment, thus the Agreement does not operate as a confidentiality agreement but as an

15   unlimited restriction on competition.

16   The confidentiality agreement held unenforceable in *Orca* defined confidential

17   information to include any information the employee learned of, possessed as a result of, or

18   accessed through employment.  *Orca,* 233 Ariz. at 417, 314 P.3d at 95.  Although the

19   definition "properly exclude[d] 'publicly known' information…", it included "within its

20   ambit information that is available through 'substantial searching of published literature' or

21   that has to be 'pieced together' from a number of publications or sources."  *Id.*  The court

22   found both restrictions untenable.  As to first, the court stated that the employer "cannot

23   deem by fiat all information [the employee] acquired through her employment

24   'confidential.'  [The employer] has no protectable interest in public information."  *Id.*  As

25   to the latter restriction, the court stated that "[i]nformation easily or readily available to the

26   public remains public knowledge and not protectable as confidential information even if a

27   member of the public may have to expend substantial time to gather it and comprehend its

28   significance."  *Id.*  At bottom, in assessing the scope of a confidentiality agreement, the

1  question is "whether the information [sought to be restricted] is truly confidential—not

2  known to the public and 'substantially inaccessible.'"  *Id.*

3  The parties argue in detail about the use of the term "know-how" in the Agreement.

4  JDM argues that "'know-how' is a term of art typically used in confidentiality provisions

5  to designate a subset of trade secrets or confidential information that is quite distinct from

6  the general knowledge an employee may acquire during employment."  (Doc. 38, p. 8

7  (citing *SI Handling Sys. Inc. v. Heisley,* 753 F.2d 1244, 1262 (3d Cir. 1985)).  Although

8  *Heisley,* a trade secrets case, did not involve a confidentiality agreement, it is nonetheless

9  instructive.  The *Heisley* court recognized that "'[t]he concept of []know-how-…is…a very

10  fuzzily defined area….'"  *Heisley,* 753 F.2d at 1261 (quoting *Van Products Co. v. General

11  Welding and Fabricating Co.,* 419 P.A. 248, 263-64, 213 A.2d 769, 777 (1965)).  The

12  court went on to identify "know-how" sufficient to constitute a trade secret as not being

13  "ability" or "experience",  "but rather the compiled products of that ability and experience

14  that had been recorded for repetitive use." *Id.* (such compilations can be graphs, charts,

15  drawings and other data).  Whereas, "the employee ability and experience that led to these

16  developments, and presumably will lead to still further developments, does not belong

17  to…" the employer. *Id.*  ("we do not think that, after employees leave, [the employer] can

18  assert proprietary rights over their problem-solving ability or knowledge of mistakes to be

19  avoided.").

20  That "know-how" as used in the Agreement means the compilation, *i.e.,* physical

21  manifestation of data or information, such as spread sheets, rather than mere knowledge, is

22  consistent with the allegations of trade secret violations that JDM has advanced thus far.

23  Nor is there any suggestion that the "discoveries, documentation, processes [and] know-

24  how" as used in the Agreement are matters of public knowledge.  If they were, then they

25  would not fall within the scope of the Agreement.  At this point in the proceeding, the

26  breach of contract claim should not be dismissed as unenforceable.

27  **BREACH.**  Defendant Fine argues that JDM cannot state a claim for breach of contract

28  because the information "does not contain anything that is secret."  (Doc. 23, p. 10).  As

1   discussed above, the allegations in the FAC plausibly support the conclusion that is not the

2   case.  Defendant Fine's motion to dismiss the breach of contract claim should be denied.

3         Defendant Godinez argues that JDM fails to sufficiently allege a breach of contract

4   claim because JDM has failed to identify "confidential information" that he allegedly used.

5   (Doc. 32, p. 13).   JDM argues that to show breach, the FAC alleges that Defendant

6   Godinez collaborated with Defendants Will, Fine, Arceo, and Uretz to copy JDM's sales

7   and marketing programs, and is now using JDM's confidential information in collaboration

8   with Defendants Will and Fine.   (Doc. 38, p.8 (citing FAC, ¶¶ 96, 161)).   Further

9   Defendant Godinez deleted files to hide his misconduct and destroy evidence of Defendant

10  Will's wrongdoing  (*Id.* at pp. 9-10 (citing FAC ¶¶98, 100)).   However, as discussed

11  above in relation to the AUTSA claim, the allegations do not sufficiently state facts to

12  support the conclusion that Defendant Godinez collaborated with the other individual

13  Defendants to copy JDM's confidential information.   Moreover, the allegation that

14  Defendant Godinez deleted unspecified files from his JDM computer to hide his

15  misconduct nowhere suggests that the deleted information fell within the definition of

16  Confidential Information under the Agreement.   Because JDM fails to allege facts to

17  support a claim that Defendant Godinez breached the Agreement, Defendant Godinez'

18  Motion to Dismiss should be granted as to the breach of contract claim.

19  **UNJUST ENRICHMENT AGAINST ALL MOVING DEFENDANTS (FIFTH CLAIM)**

20        Defendants argue that the unjust enrichment claim should be dismissed because

21  JDM fails to identify a single allegation that JDM "conferred" a benefit on all moving

22  Defendants.   Defendants Will and Fine further point out that their alleged unauthorized

23  destruction and theft of company property, which may support other claims, does not

24  support a theory of unjust enrichment which requires that the plaintiff confer a benefit upon

25  the defendant.   Defendants also argue that, although plaintiffs are permitted to plead facts

26  in the alternative, on a motion to dismiss, they must allege facts that plausibly suggest an

27  entitlement to relief, which Defendants contend is not the case here.  *See Isofoton, S.A. v.*

28  *Giremberk,* 2006 WL 1516026, *3 (D. Ariz. May 30, 2006) ("An unjust enrichment count

should not be dismissed unless it was insufficient apart from its inconsistency with other counts")).

Unjust enrichment provides a flexible "remedy when a party has received a benefit at another's expense and, in good conscience, the benefitted party should compensate the other." *Wang Elec., Inc. v. Smoke Tree Resort, LLC,* 230 Ariz. 314, 318, 283 P.3d 45, 49 (App. 2012). "'Unjust enrichment occurs whenever a person has and retains money or benefits that in justice and equity belong to another.'" *Doe,* 2009 WL at 1423378, *12. (quoting *City of Sierra Vista v. Cochise Enter., Inc.,* 144 Ariz. 375, 381, 697 P.2d 1125, 1131 (App. 1984)).  Defendants argue that the FAC contains no facts that could establish such a claim.

JDM argues that the FAC alleges that Defendants unjustly received benefits at JDM's expense through their wrongful conduct, including trespass, computer fraud, and conversion.  (Doc. 29, p.14).  Recovery for unjust enrichment is available "when equity demands compensation for benefits received, '*even though [the defendant] has committed no tort and is not contractually obligated to the [other]."  Wang,* 230 Ariz. at 318, 283 P.3d at 50 (emphasis added).  Here, JDM alleges that Defendants obtained "benefit" at JDM's expense by committing wrongful conduct including computer fraud, trespass, and conversion, which are alleged as independent claims elsewhere in the FAC against Defendants Will and/or Fine.  While a plaintiff may plead alternative claims, *see Isofoton*, 2006 WL 1516026, *3 (plaintiff may make alternative claim of unjust enrichment), the allegations in the FAC do not support the theory that JDM conferred a single benefit on Defendants.  Thus, JDM fails to state a claim for unjust enrichment.

**BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY AGAINST DEFENDANTS WILL AND FINE (SIXTH CLAIM FOR RELIEF)**

In the introduction to their Partial Motion to Dismiss, Defendants Will and Fine state they seek dismissal of this claim.  (Doc. 23, p.2).  Defendants do not specifically address this claim within their Motion or Reply.  Because Defendants Will and Fine have provided no basis as to why this claim should be dismissed, their motion to dismiss JDM's

Sixth Claim for relief should be denied.

**CIVIL CONSPIRACY CLAIM AGAINST ALL MOVING DEFENDANTS (TENTH CLAIM FOR RELIEF)**

"[L]iability for civil conspiracy requires that two or more individuals agree and thereupon accomplish 'an underlying tort which the alleged conspirators agreed to commit.'" *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons,* 201 Ariz. 474, 499, 38 P.3d 12, 37 (2002) (quoting *Baker v. Stewart Title & Trust of Phoenix*, 197 Ariz. 535, 542, 5 P.3d 249, 259 (App. 2000)).   JDM alleges that Defendants "conspired with each other to engage in the alleged wrongful conduct, including Defendants' misappropriation of trade secrets and other unfair business practices."  (FAC, ¶89).  Defendants argue that the FAC identifies only the torts of misappropriation and unfair competition in connection with civil conspiracy and JDM has failed to state a claim on those grounds.  (Doc. 36, p. 10).  Defendants also contend that because the majority of the allegations in support of JDM's civil conspiracy claim are based only on information and belief, they fail to state a claim because they are conclusory.  (*Id.* (citing FAC, ¶¶189, 190, 194 195)).

"[A]lthough allegations 'upon information and belief' may state a claim after *Iqbal* and *Twombly*, a claim must still be based on factual content that makes liability plausible, and not be 'formulaic recitations of the elements of a cause of action.'" *Klohs v. Wells Fargo Bank, N.A.*, 901 F.Supp.2d 1253, 2012 WL 4758126, at *5 n. 2 (D.Haw. Oct. 4, 2012) (quoting *Long v. Yomes*, 2011 WL 4412847, at *4 (D.Haw. Sept. 20, 2011) (quoting *Twombly*, 550 U.S. at 555)); see also *Solis v. City of Fresno*, 2012 WL 868681, at *8 (E.D.Cal. Mar. 13, 2012) ("In the post-*Twombly* and *Iqbal* era, pleading on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim."). "The facts alleged must be sufficient to nudge the claims 'across the line from conceivable to plausible.'" *Solis*, 2012 WL 868681, at *8 (quoting *Twombly*, 550 U.S. at 547); see also *Tesi v. Recon Trust NA,* 2013 WL 2635613, *4 (D.Ariz. June 12, 2013).

Defendants are correct that because JDM has failed to state a claim for unfair

competition, that claim cannot form the basis for a civil conspiracy claim.  However, as discussed earlier, JDM has stated a claim against Defendants Will and Fine for misappropriation of trade secrets.  Moreover, although based on information and belief, the allegations in the FAC, plausibly support the conclusion that the two conspired with each other to engage in such conduct in light of the fact that Defendant Will purchased AdWords "identical in name, pattern, and volume to the purchases conducted by Defendant Fine in his former role as Marketing Director at JDM."  (FAC, ¶126).

Defendant Will and Fine's motion to dismiss the civil conspiracy claim should be denied.  Because JDM has not sufficiently alleged facts of wrongdoing on behalf of the other moving Defendants that would link them to a conspiracy, the civil conspiracy claim should be dismissed as to Defendants Godinez, Uretz, and Impact Partnership.

**AIDING & ABETTING AGAINST ALL MOVING DEFENDANTS (ELEVENTH CLAIM FOR RELIEF)**

"Claims of aiding and abetting tortious conduct require proof of three elements:  (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach."  *Wells Fargo,* 201 Ariz. at 485, 38 P.3d at 23.  Defendants contend this claim, like the civil conspiracy claim, fails to sufficiently allege an underlying tort.  JDM makes the same argument it made with regard to the civil conspiracy claim (Doc. 29, pp.14-15).

For the same reasons supporting the recommendation on the civil conspiracy claim, the District Court should: (1) deny Defendant Will and Fine's motion to dismiss this claim; and (2) dismiss this claim as to Defendants Godinez, Uretz, and Impact Partnership.

**CONCLUSION**

For the reasons stated above, JDM has sufficiently alleged a claim under AUTSA and claims for civil conspiracy and aiding and abetting  against Defendants Will and Fine.  Additionally,  JDM  has  sufficiently  alleged  that  Defendant  Fine  breached  the

Confidentiality Agreement.  Further, Defendants Will and Fine have failed to offer any reason why JDM's claim for breach of fiduciary duty/duty of loyalty should be dismissed.  However, JDM has failed to state a claim against Defendants Will, Fine, Godinez, Uretz and Impact Partnership for unfair competition and unjust enrichment.  Further, JDM's AUTSA claim and claims of civil conspiracy and aiding and abetting against Defendants Godinez, Uretz and Impact Partnership should be dismissed for failure to state a claim.  Moreover, JDM's claim of  breach of contract against Defendant Godinez should also be dismissed for failure to state a claim.  Because leave to amend should be given freely and because there has been no showing that JDM's claims subject to dismissal "could not possibly be cured by the allegation of other facts," *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir. 1990), the FAC should be dismissed with leave to amend.

### RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court, after its independent review:

(1)     grant in part and deny in part Defendant Will and Fine's Partial Motion to Dismiss (Doc. 22).  Defendants' Motion should be granted to the extent that Plaintiffs' claims of unfair competition (Third Claim) and unjust enrichment (Fifth Claim) should be dismissed with leave to amend.  Defendants' Motion should be denied to the extent Defendants seek dismissal of Plaintiffs' claims:  under AUTSA (Second Claim); for breach of contract against Defendant Fine (Fourth Claim); for breach of fiduciary duty/duty of loyalty (Sixth Claim); civil conspiracy (Tenth Claim); and aiding and abetting (Eleventh Claim);

(2)     grant Defendant Impact Partnership's Motion to Dismiss (Doc. 27) with leave to amend;

(3)     grant Defendant Godinez' Partial Motion to Dismiss (Doc. 30) with leave to amend;

(4)     grant Defendant Carly Uretz' Motion to Dismiss (Doc. 34) with leave to amend.

Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District of Arizona, any party may serve and file written objections within **FOURTEEN (14) DAYS** after being served with a copy of this Report and Recommendation.  A party may respond to another party's objections within **FOURTEEN (14) DAYS** after being served with a copy. Fed.R.Civ.P. 72(b)(2).  No replies to objections shall be filed unless leave is granted from the District Court to do so. If objections are filed, the parties should use the following case number: **CV 14-2025-TUC-CKJ**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to de novo review of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED THIS 9TH DAY OF FEBRUARY, 2015.


CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE