IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joshua David Mellberg LLC, et al., | No. CV-14-02025-TUC-CKJ |
| Plaintiffs, | **ORDER** |
| v. | |
| Jovan Will, et al., | |
| Defendants. | |

  Plaintiffs Joshua David Mellberg, LLC, dba J.D. Mellberg Financial, and Joshua David Mellberg filed a First Amended Complaint asserting 11 counts against various Defendants. (Doc. 9, FAC)  Four motions are now pending before the Court: (1) Partial Motion to Dismiss filed by Defendants Jovan Will and Tree Fine (Doc. 22); (2) Motion to Dismiss filed by Defendant the Impact Partnership (Doc. 27); (3) Partial Motion to Dismiss filed by Defendants Fernando & Geovanna Godinez (Doc. 30); and (4) Motion to Dismiss filed by Defendant Carly Uretz (Doc. 34).  Following oral argument on November 13, 2014, Magistrate Judge Charles R. Pyle issued a Report and Recommendation (R & R) on February 9, 2015, (1) denying in part and granting in part Defendant Will and Fine's Partial Motion to Dismiss; (2) granting Defendant Impact Partnership's Motion to Dismiss; (3) granting Defendant Godinez' Partial Motion to Dismiss; and (4) granting Defendant Uretz' Motion to Dismiss.  (Doc. 45.)  With the exception of certain claims in the Third Claim (Unfair Competition), the Magistrate

Judge recommended that all dismissed claims be dismissed with leave to amend. (*Id.* at 33.)

Plaintiffs files objections to the R & R to the extent that it recommends that certain unfair competition claims be dismissed as based on theories too novel to be permitted to go forward. (Doc. 46.) Defendant Jovan Will objects to the R & R on the ground that the FAC contains no plain statement that Will misappropriated trade secrets. (Doc. 47.) Defendant Tree Fine objects to the R & R on the ground that the Confidentiality Agreement is facially unenforceable. (Doc. 48.)

The Court overrules the objections and adopts the R & R.

## I.   Background

Plaintiffs are Joshua David Mellberg, LLC, dba J.D. Mellberg Financial, and Joshua David Mellberg, an individual (collectively referred to as "JDM" or "Plaintiffs"). Joshua David Mellberg is the owner and President of JDM. (FAC ¶16.) He is a nationally known financial advisor based in Tucson, Arizona, and "is a pioneer and leader in marketing and selling annuities via the Internet." (*Id.* ¶¶17, 18.) JDM Mellberg Financial is a nationwide retail and wholesale insurance agency specializing "in capturing internet based leads and supplying them to a network of agents across the country. JDM began developing internet based marketing and sales funnels in 2009." (*Id.* ¶22; *see also id.* ¶23 (JDM has expended in excess of $30 million refining its sales funnels)) JDM advertises and promotes the services and products that it offers, including annuities. (*Id.* ¶¶21, 22.) A significant portion of JDM's advertising and promotional activities in the field of annuities is conducted on the internet. (*Id.* ¶21).

The individual Defendants are former employees of JDM. Also named as a Defendant is The Impact Partnership, which is a business entity that some or all of the individual Defendants are alleged to have joined or otherwise furthered the interests thereof. (*See e.g., id.* ¶¶62, 75, 87-88, 118, 138.)   As stated in the R & R, JDM's theory of the case is that the individual Defendants "devised a scheme to steal JDM's trade

secrets and confidential information, attempted to destroy evidence of their theft, and are now using that stolen information in a competing venture." (Doc. 45 at 6.)

JDM alleges the following claims for relief: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (First Claim) against all Defendants; (2) violation of the Arizona Uniform Trade Secrets Act ("AUTSA"), A.R.S. § 44-401, *et. seq*., against all Defendants (Second Claim); (3) unfair competition against all Defendants (Third Claim); (4) breach of contract against Defendants Fine, Arceo and Godinez (Fourth Claim); (5) unjust enrichment against all Defendants (Fifth Claim); (6) breach of fiduciary duty/duty of loyalty against Defendants Fine and Will (Sixth Claim); (7) breach of duties regarding Alpha Academy Advisors, LLC, against Defendant Will (Seventh Claim); (8) trespass to chattel against Defendant Fine (Eighth Claim); (9) theft/conversion against Defendant Fine (Ninth Claim); (10) civil conspiracy against all Defendants (Tenth Claim); and (11) aiding and abetting against all Defendants (Eleventh Claim).

Pursuant to Fed.R.Civ.P. 12(b)(6), Defendants Will, Fine, Godinez, Uretz, and The Impact Partnership seek dismissal of JDM's Second, Third, Fifth, Tenth, and Eleventh Claims for failure to state a claim. Additionally, Defendants Fine and Godinez seek dismissal of JDM's Fourth Claim for relief for failure to state a claim, and Defendants Fine and Will seek dismissal of JDM's Sixth Claim for relief for failure state a claim.

**II.     Standard of Review**

The Court reviews de novo the objected-to portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The Court reviews for clear error the unobjected-to portions of the Report and Recommendation.  *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *see also, Conley v. Crabtree*, 14 F.Supp.2d 1203, 1204 (D. Or. 1998).

The standard for a motion to dismiss is correctly stated in the R & R and will not be repeated here. (Doc. 45 at 3-5.)

**III. Findings and Conclusions of the Magistrate Judge and Parties' Objections**

**A. Plaintiffs' Objection**

Plaintiffs' Third Claim is for unfair competition against all Defendants. The FAC alleges as unfair competition that, inter alia, "Defendants have engaged in unlawful business acts or practices by committing acts including computer fraud, trespass, conversion, and other illegal acts as practices as alleged above, all in an effort to gain unfair competitive advantage over JDM."[1] (FAC ¶147.) The R & R recognizes a cause of action in Arizona for unfair competition based on the misappropriation of confidential information that does not rise to the level of a trade secret under the Arizona Uniform Trade Secrets Act (AUTSA).[2] (Doc. 45 at 25.) But Magistrate Judge Pyle dismissed certain claims in the Third Claim; he recommended that the Court should be reluctant to allow Plaintiffs' unfair competition claims based on specifically alleged unfair business practices—conversion, trespass, and computer fraud—that are novel to Arizona. (Doc. 45 at 25.) Plaintiffs object to the latter recommendation as reflective of an overly narrow view of unfair competition law that is inconsistent with Arizona authorities.

The Arizona Supreme Court has recently held that the AUTSA "creates an exclusive cause of action—and displaces conflicting causes of action—for claims based on the misappropriation of trade secrets." *Orca Commc'ns. Unlimited, LLC v. Noder,* 337 P.3d 545, 546 (Ariz. 2014) (*Orca II*). The Court also held that assuming the viability of a common law claim for misappropriation of confidential information, AUTSA "does not displace common-law claims based on alleged misappropriation of confidential information that is not a trade secret." *Id.* The Court, which was reviewing the lower courts' decision on a motion to dismiss, declined to "decide today what aspects, if any, of the confidential information alleged in [the plaintiff's] unfair competition claim might

---

[1] Computer fraud is also separately asserted in the First Claim, Trespass is separately alleged in the Eighth Claim, and Theft/Conversion is separately alleged in the Ninth Claim.

[2] The claim was dismissed with leave to amend, and Plaintiffs' objection is not directed at that portion of the R & R. (Doc. 46 at 4, n.1.)

- 4 -

fall within AUTSA's broad definition of 'trade secret' and therefore be displaced….That determination will not hinge on the claim's label, but rather will depend on discovery and further litigation that has not yet occurred." *Id.* at 549 (citations omitted). Magistrate Judge Pyle ruled that in light of *Orca II,* it cannot be said at this point in the litigation that JDM's claim is preempted by AUTSA to the extent it may involve confidential information that does not constitute trade secrets. (Doc. 45 at 23.)

The Arizona Supreme Court also declined to decide whether Arizona recognizes a common-law claim for unfair competition as alleged in Orca's complaint.

> Nor do we decide whether Arizona recognizes a common-law claim for unfair competition as alleged in Orca's complaint. Cf. Restatement (First) of Torts §§ 757, 759 (1939) (enumerating several theories of liability, including disclosure or use of another's trade secret, and improper acquisition of information, whether or not it constitutes a trade secret, to advance a rival business interest). Compare *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124 ¶¶ 8–9, 970 P.2d 954, 956 (App.1998) (finding plaintiff's unfair-competition claim preempted by federal copyright law, and noting that such a claim is "based on principles of equity" and "encompasses several tort theories," including "misappropriation"), with Restatement (Third) of Unfair Competition § 1 cmt. g (1995) (noting that the "specific forms of unfair competition [described therein] do not fully exhaust the scope of statutory or common law liability for unfair methods of competition"), and Restatement (Second) of Agency §§ 395, 396 (1958) (describing agent's duty not to use or disclose confidential information acquired during the course of his agency in competition with principal).

*Orca II*, 337 P.3d at 549-550.

Plaintiffs argue that Arizona courts have stated that "[t]he common law doctrine of unfair competition is based on principles of equity," *Fairway Constructors, Inc.*, 970 P.2d at 956, and because of the doctrine's equitable underpinning, the "tort of unfair competition is extremely flexible[.]" *Golden Nugget, Inc. v. American Stock Exchange, Inc.*, 828 F.2d 586, 591 (9th Cir. 1987). Plaintiffs contend that the only requirements in Arizona for the tort of unfair competition are that the plaintiff show either "that it was engaged in competitive business with [the defendant] or that [the defendant's] actions were likely to produce public confusion[.]" *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) (emphasis added). In declining to

decide whether Arizona recognizes a common-law claim for unfair competition, the Court pointed to *Restatement (Third) of Unfair Competition*, which suggests that lower Arizona courts may follow the *Restatement*: *Restatement (Third) of Unfair Competition* § 1 cmt. g (1995) (noting that the "specific forms of unfair competition [described therein] do not fully exhaust the scope of statutory or common law liability for unfair methods of competition"). *Orca II*, 337 P.3d at 549. Plaintiffs argue that this is consistent with the rule in Arizona that in the absence of controlling Arizona authority, Arizona courts follow the Restatement of the Law. *See Lerner v. DMB Realty*, LLC, 322 P.3d 909, 916 n.7 (Ariz. App. 2014). The *Restatement Third of Unfair Competition* acknowledges the flexible nature of the doctrine:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless: (a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to: (1) deceptive marketing, as specified in Chapter Two; (2) infringement of trademarks and other indicia of identification, as specified in Chapter Three; (3) appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four; or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.

§ 1 (emphasis added). Plaintiffs further contend that Comment (g) to this section of the *Restatement* further elucidates the broad and flexible application of the doctrine:

> A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market. Certain recurring patterns of objectionable practices form the basis of the traditional categories of liability specifically enumerated in Subsection (a)(1)-(3). ***However, these specific forms of unfair competition do not fully exhaust the scope of statutory or common law liability for unfair methods of competition, and Subsection (a) therefore includes a residual category encompassing other business practices determined to be unfair.***

*Restatement (Third) of Unfair Competition* § 1 (1995) (emphasis added).

Defendant The Impact Partnership files a response, which is joined by Defendants Will, Fine, Godinez, and Uretz. (Docs. 49, 50.) They assert that *Sutter Home*, on which Plaintiffs rely, contains no analysis of the issue and cites a single Arizona Supreme Court

1  opinion, from 1945. *See Sutter Home*, 971 F.2d at 407 (citing *Lininger v. Desert Lodge*, 63 Ariz. 239, 160 P.2d 761 (1945)). They contend that since *Desert Lodge*, the Arizona Supreme Court has twice held that "the universal test [for unfair competition] is whether the public is likely to be confused." *Boice v. Stevenson*, 187 P.2d 648, 653 (Ariz. 1947)(emphasis added); *see also O'Hara v. Lance*, *7*267 P.2d 725, 728 (Ariz. 1954)(same). They also argue that *Desert Lodge* was a trade name dispute between the owners of "The Lodge on the Desert" and "Desert Lodge." The court expressly limited its analysis to disputes over trade names. They point out that this court refused to recognize a claim for unfair competition in the absence of public confusion on two occasions. (Doc. 49 at 2-3, citing *Doe v. Arizona Hospital & Healthcare Association*, 2009 WL 1423378 at *12 (D. Ariz. Mar. 19, 2009) and *Act Group, Inc. v. Hamlin*, 2012 WL 2976724, at *8 (D. Ariz. July 20, 2012).)

First, the Court is not persuaded that the Magistrate Judge's ruling was based on the failure to allege public confusion. In addition, the unfair competition claims in *Orca* do not appear to involve public confusion. Nevertheless, the Court overrules Plaintiffs' objection. The reference to the Restatements in *Orca II* was solely in the context of a theory of unfair competition based on misappropriation. The Arizona courts have previously stated that "the doctrine [of unfair competition] encompasses several tort theories, such as trademark infringement, false advertising, 'palming off,' and *misappropriation*." *Fairway Constructors, Inc.*, 970 P.2d at 956 (emphasis added). Pursuant to *Orca II,* Plaintiffs will be permitted to amend the claim of unfair competition based on misappropriation of confidential information that is not a trade secret. But this Court does not read the language in *Orca II* as inviting additional expansion of the doctrine of unfair competition, and Plaintiffs cite no cases outside Arizona that recognize unfair competition as including theories of computer fraud, trespass, or conversion. Moreover, Plaintiffs have separately asserted claims for computer fraud, trespass, and conversion.

### B. Defendant Will's Objection

The R & R finds that Plaintiffs state a claim against Defendant Will for misappropriation of trade secrets. (Doc. 45 at 11-12.) Defendant Will objects, asserting that the FAC does not contain a plain statement of the claim that Will misappropriated trade secrets. (Doc. 47 at 1.)

According to Will, the R & R identifies six paragraphs that address the trade secrets claim against Will, two of which do not rise to the level of misappropriation—¶¶ 38, 39 alleging access to client lists. (Doc. 47 at 2; ref. Doc. 45 at 11.) The R & R summarizes the remaining four paragraphs against Will as follows:

> JDM alleges that he . . . hosted an unauthorized webinar using JDM proprietary materials, (FAC, ¶¶ 47, 48), and postemployment with JDM, gained unauthorized access to "JDM web domains and, with that access secured, in November, 2013 . . . illegally downloaded the content of those sites, including all of JDM's training and educational videos[]" (FAC ¶¶ 121-120).

(Doc. 45 at 11 (quoting FAC ¶¶ 47-48, 120-121).)

Will argues that allegations that he "hosted an unauthorized webinar" (FAC ¶¶ 47, 48) cannot support a claim for misappropriation of trade secrets because on their face, the allegations relate to actions Will took "in July of 2013 . . . through AAA" (FAC ¶47), which led to "an agreement to wind down AAA" (FAC ¶48.) The FAC alleges that AAA was at the time an LLC formed by Will and Plaintiff Josh Mellberg (FAC ¶40), "to provide sales and marketing training to agents outside of JDM" and "to market to and recruit agents to work with JDM." (FAC ¶42.) Will contends that his actions cannot be misappropriation because he owned the entity with Plaintiff.

Will asserts that the allegation that he hosted a webinar "using JDM proprietary materials" is conclusory. A "plaintiff seeking relief for misappropriation of trade secrets must describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *HTS, Inc. v. Boley*, 954 F. Supp. 2d 927, 944 (D.

Ariz. 2013) (quoting *Imax Corp v. Cinema Tech., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998)). The FAC does not distinguish the "proprietary materials" from general knowledge in the trade and fail to allege any facts whatsoever to identify what portion of the webinar constituted a trade secret.

Will also argues that Plaintiffs' FAC allegations fail to plead sufficient facts to show that the information both

> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ariz. Rev. Stat. § 44-401(4).  Both are essential elements for information to rise to the level of a trade secret.

Will further contends that the allegations of downloaded "web content" are insufficient because the allegations suggest that the "web content" is not secret; rather, it is readily available to all of Plaintiffs' clients. The "hallmark of trade secrets is their secrecy." *Householder Grp., LLLP v. Van Mason*, 2012 WL 4513635 (D. Ariz. Sept. 30, 2012). Plaintiffs admit that the "web content," including the "training and educational videos," were "available on a password-protected basis to agents that register for and pay for JDM's services." (FAC ¶119.)  Will argues that information accessible to anyone who pays for access is not secret. In addition, Plaintiffs have alleged no facts to plausibly support "trade secret" status for the content they make available on the internet. Furthermore, the FAC does not allege that Will ever "used" the allegedly illegal downloads of JDM's training videos. (*See* FAC ¶¶ 122-126, alleging that Will was told to stop using a client list, had launched websites, and was using JDM's third-party compliance consultant – not that Will was using the training videos.)

Plaintiffs respond that they allege sufficient facts to state a claim and that Will's objections are at odds with the applicable pleading standard.  (Doc. 51 at 4.)  The FAC's detailed identification and description of Plaintiffs' trade secrets satisfies the notice

1 pleading standard because it plausibly appears that trade secrets are involved. Plaintiffs are not required to disclose the actual trade secrets in the Complaint. For example, in *W.L. Gore & Assocs. v. GI Dynamics, Inc.* (*Gore I*), No. CV-10-8088, 2010 WL 5184254, at *8 (D. Ariz. Dec. 15, 2010), the complaint alleged broad categories of confidential information including "market studies, financial information, manufacturing methods, and [counterclaimant's] future plans." *Id.* The court found that these categories were sufficient to state the existence of trade secrets in light of *Iqbal*. *Id.*

Here, Plaintiffs' allegations, like the categories of information alleged in *Gore I*, include misappropriation of their training materials, confidential client and marketing lists, advertising data, call center metrics, proprietary sales processes, metrics, and scripts, sales and marketing programs, advertising copy still in development, and password protected training and educational videos. (FAC ¶¶ 24, 27, 39, 48, 61, 85, 88, 96, 105, 115, 117, 119.)[3] Plaintiffs assert that the FAC also describes in detail the types of information that are secret (*id.*, ¶ 24(a)-(k)), the effort, cost, and time it took JDM to develop the trade secrets (*id.*, ¶¶ 22-24), and the efforts JDM takes to maintain the secrecy of its trade secrets (*id.* ¶¶ 28-31).

Plaintiffs allege not only that Will misappropriated the ideas or secrets behind Plaintiffs' trade secrets but also that he systematically and wrongfully misappropriated physical manifestations and embodiments of Plaintiffs' trade secrets. (*See e.g.*, *id.* ¶¶ 24-27, 39, 48, 55-58, 61, 64, 69, 75, 85, 88, 96, 105, 114, 115, 117, 119, 121.)

Plaintiffs further argue that even if some aspects of the trade secrets are publically available, that would not warrant dismissal of the claim. As the Arizona Court of Appeals observed in the *Enterprise Leasing v. Ehmke*:

> Although matters of general knowledge cannot be appropriated as secret, a trade secret may consist of a combination of elements even though *each* individual component may be a matter of common knowledge.

---

[3] The Court notes that several of these paragraphs do not allege categories of materials related to conduct by Will.

- 10 -

3 P.3d 1064, 1079 (Ariz. App. 1999). Trade secrets "may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Id.* at 1068 (citations omitted). Thus, training videos, business plans, customer information, and marketing techniques can be trade secrets.

As to efforts to maintain secrecy, Plaintiffs argue that the owner of the secret information need only show that it made reasonable efforts to maintain its secrecy to ensure that it would be difficult for others to discover it without using improper means. *Id.* at 1070. The FAC alleges significant, reasonable and sufficient measures to protect the secrecy of the materials and information in issue. (FAC ¶¶ 28-30.)

Finally, The FAC alleges misappropriation of more than general knowledge; Defendants are charged with misappropriating and using J.D. Mellberg Financial's actual, physical proprietary information -- the physical manifestations of Plaintiffs' trade secrets.

The Court overrules Will's objection. The R & R makes specific findings regarding trade secrets, economic advantage, and protection of trade secrets, including references to website materials. (Doc. 45 at 7-10.) As the Magistrate Judge noted, these issues are common to the motions filed by all Defendants. At this stage of the litigation, the Court need not decide whether the "web content" is, in fact, a trade secret. As the Magistrate Judge found, the allegations of trade secrets are plausible on their face. (*Id.* at 11.)

Moreover, in addition to the paragraphs cited by Will, the Magistrate Judge noted additional allegations in the FAC directed at Will. Specifically, the R & R states:

> JDM also alleges that Defendant Will approached Defendant "Impact Partnership to launch a web-based lead program that mirrors the JDM program and that clients and agents of Advisors Excel have received marketing regarding the lead program. JDM's internal advisors also received this marketing." (FAC, ¶122). Further, "Defendant Will launched several websites very similar to JDM sites…." (FAC, ¶124) and one of his websites "is purchasing AdWords and keywords identical in name, pattern, and volume to the purchases conducted by Defendant Fine in his former role as Marketing Director at JDM." (FAC, ¶126). The allegations plausibly suggest that Defendant . . . Will . . . not only had access to trade secret

information, but that [he has] acquired that information and [is] using it as well.

In other words, although the FAC does not specifically assert that Will used the training and educational videos, it asserts that he illegally downloaded them, and in the next paragraph asserts that Advisors Excel notified Plaintiffs that Will had approached The Impact Partnership to launch a web-based lead program, that mirrors the JDM program and that clients and agents had received the marketing regarding the lead program. (FAC ¶¶121, 122.) The FAC also alleges that Will had launched websites very similar to JDM websites. (*Id.* ¶124.) This is sufficient factual content to allow the Court to draw the reasonable inference that Will may be liable for misappropriation. Viewed in its entirety, the Court finds the allegations in the FAC sufficient to state a claim against Will for misappropriation of trade secrets.[4]

### C. Defendant Fine's Objection

The R & R finds that Plaintiffs state a claim against Defendant Fine for misappropriation of the physical manifestations of JDM's trade secrets. (Doc. 45 at 12-13.) Defendant Fine argues that even if, as Magistrate Judge Pyle found, Fine misappropriated the physical manifestation of trade secrets—i.e. specifically, spreadsheets compiling internet advertising data—the Confidentiality Agreement constitutes an unenforceable noncompetition agreement. (Doc. 48 at 1-2.)

In Arizona, an overly broad confidentiality agreement amounts to a noncompetition agreement. *See Orca Commc'ns. Unlimited, LLC v. Noder*, 314 P.3d 89, 95 (Ariz. App. 2013) (*Orca I*), depublished in part on other grounds, *Orca II,* 337 P.3d at 550 (depublishing ¶¶ 28-31). In turn, a noncompetition agreement must be limited in time and in geography or it is unenforceable. *Orca I*, 314 P.3d at 95.

---

[4] Will is also a Defendant in the First Claim, Computer Fraud and Abuse; the Fifth Claim, Unjust Enrichment; the Sixth Claim, Breach of Fiduciary Duty; the Seventh Claim, Breach of Duties Re: Alpha Academy Advisors; the Tenth Claim, Civil Conspiracy; and Eleventh Claim, Aiding and Abetting.

- 12 -

In the FAC, Plaintiffs allege that Defendant Fine entered into a confidentiality agreement precluding him from:

> disclos[ing] Confidential Information, directly or indirectly, under any circumstances, or by any means, to any third person without the express written consent of the Company . . . [or] copy[ing], transmit[ting], reproduc[ing], summariz[ing], quot[ing], or mak[ing] any commercial or other use whatsoever of Confidential Information, except as may be necessary to perform [his] duties for the Company.

(Doc. 45 at 26 (quoting FAC ¶¶157, 158 & Ex. 1 §§ 5, 6).) According to Fine, the impermissibly broad definition of "Confidential Information" includes:

> (a) proprietary information of the Company, (b) **information marked or designated by the Company as confidential**, (c) information, whether or not in written form and whether or not designated as confidential, that is known to me as being treated by the Company as confidential; and (d) information provided to the Company by third parties that the Company is obligated to keep confidential. Confidential Information includes, but is not limited to, client lists, financial information related to client accounts, **discoveries, documentation, processes, know-how,** marketing plans and other financial and technical information.

(Doc. 45 at 26 (quoting FAC Ex. 1 § 1) (emphasis added).)

In the Motion to Dismiss, the parties largely disputed the use of the term "know-how." The Magistrate Judge adopted the Third Circuit's definition of "know-how" that is sufficient to constitute a trade secret; it is not "ability" or "experience," "but rather the compiled products of that ability and experience that had been recorded for repetitive use." *SI Handling Sys. Inc. v. Heisley,* 753 F.2d 1244, 1262 (3d Cir. 1985) (such compilations can be graphs, charts, drawings and other data). "The employee ability and experience that led to these developments, and presumably will lead to still further developments, does not belong to" the employer. *Id.* ("we do not think that, after employees leave, [the employer] can assert proprietary rights over their problem-solving ability or knowledge of mistakes to be avoided.").

Thus, the Magistrate Judge reasoned that "know-how" as used in the Agreement here means the compilation, *i.e.,* physical manifestation of data or information, such as spread sheets, not mere knowledge. Furthermore, such a meaning is consistent with the allegations of trade secret violations that JDM has advanced. The Magistrate Judge also

noted there no suggestion that the "discoveries, documentation, processes [and] knowhow" as used in the Agreement are matters of public knowledge. If they were, then they would not fall within the scope of the Agreement because it specifically excludes "information that the Company now or hereafter voluntarily disseminates to the public or that otherwise becomes part of the public domain through lawful means." (Doc. 45 at 27-28; FAC, Ex. 1, Sec. 8.)

In his objection, Fine reasserts that the Agreement is overly broad, and he cites to *Orca I*.

In *Orca I*, the employee Noder signed a confidentiality covenant that

> prohibited Noder from 'directly or indirectly circumvent[ing] or compet[ing] with The Company with regard to any Confidential Information.' The Agreement defined confidential information in section 2.2 as 'knowledge or information not generally known to the public or in the public relations industry' that Noder learned from her employment with Orca that related to Orca, its business partners, or the business of its customers or potential customers. This included 'any information [Noder] learn[ed] of, possess[ed] as a result of, or access[ed] through' Noder's employment. The definition excluded 'publicly known' information, information 'readily accessible to the public in a written publication,' but included information that was only available through 'substantial searching of published literature' or that had to be 'pieced together' from a number of publications or sources. In the event of a dispute, the covenant placed on Noder the burden of proving that information was not confidential.

*Orca I*, 314 P.3d at 92. The Court of Appeals reasoned that the

> the Agreement's definition of 'confidential information' extends far beyond the 'truly confidential.' The definition properly excludes 'publicly known' information, and further defines 'publicly known' as 'readily accessible to the public in a written publication,' but then includes within its ambit information that is available through 'substantial searching of published literature' or that has to be 'pieced together' from a number of publications or sources. The definition also includes as confidential, 'any information' Noder 'learn[ed] of, possess [ed] as a result of, or access[ed] through employment' with Orca.

*Id.* at 94-95.

Thus the court held that the definition of confidential information was overbroad because (1) it deemed public information confidential if the public had to do substantial searching or to combine information, and (2) it deemed confidential any information that the employee might have come across during her employment with Orca, regardless of

- 14 -

whether the information was truly confidential. As to the first ground, the court stated that information available to the public remains public knowledge even if a member of the public has to expend substantial time to gather or comprehend it. As to the second ground, the court said that Orca cannot by fiat deem confidential all information Noder obtained through her employment with Orca. *Id*. at 95.

As noted, according to the Agreement here, "Confidential information" encompasses "discoveries, documentation, processes, [and] know-how, marketing plans, and other financial and technical information." (*Id.*) In his objections, Fine argues that as the Confidentiality Agreement extends beyond the "truly confidential," and includes all information "designated" or "treated" by the company as confidential. (Doc. 48 at 3.) He contends that it is overbroad because it purports to prevent him from using most, if not all, of the information he learned from his employment, including any information the company unilaterally designates as confidential and any information related to his or the company's "documentation, processes, [or] knowhow" (among other things). This imposes an unlimited restriction against competing with JDM. (Doc. 48 at 3-4.) Even assuming the spreadsheets are confidential, the Confidentiality Agreement is, nevertheless, overly broad because, on its face, it includes much more than spreadsheets.

Plaintiffs respond that this Agreement is not like the one in *Orca*. This Agreement nowhere expressly defines as "Confidential" information that is available to the public; in fact, it expressly excludes such information. And the Agreement at issue here does not define as confidential "*any* information" acquired by Defendant Fine during his employment with JDM. As the Magistrate Judge held, "know-how" is a term of art typically used in confidentiality provisions to designate a subset of trade secrets or confidential information that is quite distinct from the general knowledge an employee may acquire during employment. *See e.g.*, *SI Handling Sys., Inc.*, 753 F.2d at 1262 (noting that while an employee's "know-how" with regard to specific methods and techniques may be protected under trade secret law, an employee may still be entitled to

use his "experience, knowledge, memory, and skill, which he gained" from his previous employment) (quotations omitted).

The Court finds that the Confidentiality Agreement here is not like the Agreement in *Orca I*. The Agreement in *Orca I* was overly broad on its face largely because although it purported to exclude publically known information from what was deemed confidential, it also, in fact, included information available to the public. The Agreement here may include items or information that are not truly confidential but does not do so necessarily. As the Magistrate Judge noted, the Agreement specifically excludes "information that the Company now or hereafter voluntarily disseminates to the public or that otherwise becomes part of the public domain through lawful means." (FAC, Ex. 1, Sec. 8.) In other words, it does not contain an impermissible limitation on what constitutes public information. And, unlike *Orca I*, it does not define as confidential "*any* information" acquired by an employee while working for Plaintiffs.

**IV. Conclusion**

The Court will overrule the objections to the R & R. In addition, the Court has reviewed and considered the Motions to Dismiss, the responses, the replies, the exhibits, and the R & R and, after an independent review, of the unobjected to portions of the R & R finds no clear error.

Accordingly,

**IT IS ORDERED:**

(1) The Report and Recommendation (Doc. 45) is **ADOPTED**;

(2) The pending motions (Docs. 22, 27, 30, and 34) are granted and denied as follows:

(a) Defendants Will and Fine's Partial Motion to Dismiss (Doc. 22) is granted to the extent that Plaintiffs' claims of unfair competition (Third Claim) and unjust enrichment (Fifth Claim) are dismissed. The motion is denied to the extent that they seek dismissal of claims under AUTSA (Second Claim); claims for breach of contract (Fourth

1  Claim); claims for breach of fiduciary duty/duty of loyalty (Sixth Claim); claims for civil
2  conspiracy (Tenth Claim); and claims for aiding and abetting (Eleventh Claim);

3      (b)    Defendant Impact Partnership's Motion to Dismiss (Doc. 27) is granted;

4      (c)    Defendant Godinez' Partial Motion to Dismiss (Doc. 30) is granted; and

5      (d)    Defendant Carly Uretz' Motion to Dismiss (Doc. 34) is granted.

6      (3)    Dismissed claims are dismissed with leave to amend, with the exception of
7  certain claims for unfair competition (Third Claim).  Claims for unfair competition
8  regarding misappropriation of confidential information that do not rise to the level of a
9  trade secret are dismissed with leave to amend; other claims for unfair competition are
10 dismissed with prejudice.

11      (4)    Plaintiffs may file a second amended complaint within 30 days of the date
12 of this Order as set forth herein and in the Report and Recommendation.

14  Dated this 27th day of March, 2015.

*[signature]*
Cindy K. Jorgenson
United States District Judge