1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9   Joshua David Mellberg, LLC d/b/a J.D.)     No. CV-14-02025-TUC-CKJ (CRP)
    Mellberg Financial, an Arizona limited)
10  liability company, et al.,              )
                                            )
11              Plaintiffs,                 )
                                            )
12  vs.                                     )     **REPORT AND**
                                            )     **RECOMMENDATION**
13                                          )
    Jovan Will, an individual, et al.,      )
14                                          )
                Defendants.                 )
15                                          )
                                            )
16  _____)

17

18        Defendant The Impact Partnership, LLC ("Impact Partnership" or "Impact") has filed

19  a Motion to Dismiss Second Amended Complaint (Doc. 55) and Memorandum in Support

20  (Doc. 55-1) ("MTD").  Plaintiffs have filed a Response to the Motion to Dismiss (Doc. 60,

21  Resp.) and Defendant Impact has filed a Reply in Support of Motion to Dismiss the Second

22  Amended Complaint (Doc. 61).  This matter has been referred to the Magistrate Judge for

23  a Report and Recommendation. (Doc. 67, Order).  For the following reasons, the Magistrate

24  Judge recommends that Defendant's Motion to Dismiss the Second Amended Complaint

25  should be denied.

26        Plaintiff Joshua David Mellberg, LLC d/b/a J.D. Mellberg Financial ("JDM") is an

27  Arizona limited liability company with its principal place of business in Tucson, Arizona.

28

(Second Amended Complaint ("SAC") ¶ 1). Individual Plaintiff Joshua David Mellberg, a nationally known financial advisor and advocate of retirement plans that include annuity components, is JDM's owner and President. (*Id* ¶¶ 18-20). "Annuities are among the financial services products that JDM offers to its clients." (*Id*. ¶ 22). The SAC describes JDM as a "nationwide retail and wholesale insurance agency that specializes in capturing internet based leads and supplying them to a network of agents across the country." (*Id.* ¶ 24). JDM asserts that its "business advantage is derived in part from confidential and proprietary business information and practice, and from trade secrets that it has developed in its long history of business." (*Id*. ¶ 26).

The individual Defendants Jovan Will, Tree Fine, John Steve Arceo, Fernando Godinez, Patricia Latham and Carly Uretz, are former employees of JDM or were associated with JDM at various periods between 2009 and 2013. (*Id*. ¶¶ 38, 74, 77, 116, 118, 134, 141, 151-52, 154, 160, 162, 167).[1] Defendant Impact Partnership is alleged to be a Georgia limited liability company with its principal place of business in Kennesaw, Georgia, and "a marketing organization in the insurance and annuity industry." (*Id*. ¶ 3). JDM has asserted claims against Impact Partnership based on Misappropriation of Trade Secrets Information under the Arizona Uniform Trade Secret Act, A.R.S. § 44-401, et seq. (Second Claim for Relief); Unfair Competition (Third Claim for Relief); Civil Conspiracy (Ninth Claim for Relief); and Aiding and Abetting (Tenth Claim for Relief). (Doc. 54, SAC at ¶¶ 185-206, 236-45). Defendant Impact moves to dismiss all claims asserted against it based on Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.   Standards

"Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relie[f]." *Johnson v. City of Shelby, Mississippi*, __ U.S. __, 135 S.Ct. 346 (2014) (quoting Fed.R.Civ.P. 8(a)(2)). The complaint must contain a set of facts

---

[1] Defendants Will, Fine, Arceo, Godinez, and Uretz have filed Answers to the Second Amended Complaint. (See Doc. 56-59, 81). A Clerk's entry of default has been filed as to Defendant Latham. (Doc. 70).

1    that serves to place the defendant on notice as to the nature and basis of the claims. *Bell*

2    *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

3      "'To survive a motion to dismiss  [under Rule 12(b)(6)], a complaint must contain

4    sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

5    face;' that is, plaintiff must 'plead[ ] factual content that allows the court to draw the

6    reasonable inference that the defendant is liable for the misconduct alleged.'" *Telesaurus*

7    *VPC, LLC. v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S.

8    662, 678 (2009)); *see also Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir.

9    2009) (to defeat a motion to dismiss, the "non-conclusory 'factual content,' and reasonable

10    inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff

11    to relief."). Dismissal under Rule 12(b)(6) can be based on the "lack of a cognizable legal

12    theory or the absence of sufficient facts alleged under a cognizable legal theory."

13    *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011).

14      "[T]he tenet that a court must accept as true all of the allegations contained in a

15    complaint..." does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678; *see also*

16    *Telesaurus*, 623 F.3d at 1003 (pleadings that are no more than legal conclusions "'are not

17    entitled to the assumption of truth.'") (quoting *Iqbal*, 556 U.S. at 679). Thus "[t]hreadbare

18    recitals of the elements of a cause of action, supported by mere conclusory statements, do not

19    suffice." *Iqbal*, 556 U.S. at 678. The court "cannot assume any facts necessary to [the

20    plaintiffs']...claim that they have not alleged." *Jack Russell Terrier Network of N. Cal. v.*

21    *Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005).

22      The court will assume "'well-pleaded factual allegations,' ...to be true, 'and then

23    determine whether they plausibly give rise to an entitlement to relief.'" *Telesaurus*, 623 F.3d

24    at 1003 (quoting *Iqbal*, 556 U.S. at 679); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial

25    plausibility when the plaintiff pleads factual content that allows the court to draw the

26    reasonable inference that the defendant is liable for the misconduct alleged."). "The

27    plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

28    sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

1   Determining plausibility is a "context-specific task..." that requires the court to "draw on its

2   judicial experience and common sense." *Id*. at 679.  A complaint cannot survive dismissal

3   where the court can only infer that a claim is merely possible rather than plausible.  *Id*.

4   **II.      JDM's Second Amended Complaint**

5             As relevant to the issues concerning Impact Partnership, the following allegations are

6   asserted in the SAC.  Defendant Jovan Will worked for JDM from early 2009 through

7   August 2013 in general sales and marketing and in developing a JDM subsidiary.  (SAC ¶

8   38, 40).  During his employment at JDM, Will allegedly had access to JDM's confidential

9   client and marketing lists and to the confidential client/agent list of Advisors Excel, one of

10  JDM's product partners/vendors.  (*Id*. ¶¶ 44-45).  In late January 2014, JDM learned from

11  Advisors Excel that Defendant Will had approached Impact Partnership "to launch a web-

12  based lead program that mirrors the JDM program and that clients and agents of Advisors

13  Excel [had] received marketing regarding the lead program." (*Id*. ¶ 60).  In February 2014,

14  Advisors Excel's counsel sent Impact and Will a letter "demanding that they stop using their

15  client list that Will obtained while working for JDM."  (*Id*. ¶ 61).  JDM alleges that in

16  February 2014, Defendant Will, acting individually or in concert with Defendants Fine,

17  Impact Partnership, Godinez, Uretz, and Arceo had launched websites similar to JDM's

18  websites, including www.annuityangel.com and www.thecashflowcollege.com. (*Id*. ¶ 62).

19  JDM claims that Annuity Angel is using the same media outlets JDM used for years such as

20  Newsmax.  (*Id*. ¶ 65).

21            JDM asserts that based upon information and belief, Defendant Will developed and

22  hosted a Cashflow College event that was introduced to agents on March 18, 2014.  (*Id*. ¶

23  66). Defendant Will has claimed that the Cashflow College presentation is based on new

24  sales ideas and case design concepts his team discovered but the Cashflow College sales

25  presentation including formatting, examples, vocabulary, and outlining agenda is "almost

26  identical" to "JDM's  customized Face-2-Face program." (*Id*. ¶ 69).  In some cases, it uses

27  the same slides JDM created for Face-2-Face to which all individual Defendants had access

28  during their JDM employment. (*Id*.).  During his presentation, Defendant Will publicly

disclosed confidential JDM information to seek business from advisors and agents.  (*Id.* ¶ 70).  Defendant Will allegedly uses "the exact same business model, call center concept, sales scripts, sales processes and Internet campaigns as JDM."  (*Id.*).

Defendant Will allegedly  "continues to engage in the interference with contractual relations by contacting JDM employees and contracted agents ... to have them break their contracts with JDM and join Annuity Angel and Impact Partnership."  (*Id.* ¶ 71).  Defendant Will "has successfully recruited  at least a number of JDM agents and it is believed that he did so by utilizing a list of JDM agents that was stolen by Defendant Latham prior to her leaving JDM."  (*Id.*).

Defendant Tree Fine was hired by JDM as its Online Marketing Manager in July 2010 and continued in that capacity until he was promoted to Marketing Manager in August 2013.  (*Id.* ¶ 74). Defendant Fine was responsible for purchasing advertising, including web-based advertising, based on AdWords and key words for which  JDM has spent millions of dollars developing the associated analytics.  (*Id.* ¶ 75).  Defendant Fine executed a Confidentiality Agreement but refused to sign an updated version of the Confidentiality and Non-Compete Agreement in September 2013.  (*Id.* ¶ 76).  Fine resigned from JDM on November 14, 2013.  (*Id.* ¶ 77).  Before leaving JDM's employment, Defendant Fine caused forensic wipes of the computer devices he had used at JDM.  (*Id.*  ¶¶ 78-86).  JDM alleges that Fine "wiped the hard drives of his JDM computers in an attempt to conceal evidence of his misappropriation of JDM trade secrets that he was intending to use in conjunction with a planned new competing business venture along with Defendants Will and Impact (Partnership), and the other Individual Defendants."  (*Id.* ¶ 86).  Defendant Fine misappropriated JDM's "trade secrets, including but not limited to its Internet advertising data" for use in the competing business venture with Will, Impact Partnership and the other individual defendants. (*Id.* ¶ 87).

In February 2014, JDM allegedly learned that Defendants Fine and Will had associated themselves with Defendant Impact Partnership and that these three defendants "were in the process of launching an Internet marketing portal for insurance and annuity

agents that would compete directly with JDM's Internet marketing portal." (*Id*. ¶ 88). JDM's attempts to recover data from the hard drive of one of Fine's computers revealed that Fine was in contact with Impact Partnership before he resigned from JDM and "was in fact working on projects for Impact (Partnership) and other third parties while still employed by JDM in violation of the fiduciary duty and duty of loyalty he owed to JDM." (*Id.* ¶ 90).

On April 2, 2013, Defendant Fine allegedly accessed various websites for or links to Retirement Income Network and Retirement Income Network is now affiliated with Impact Partnership. (*Id*. ¶ 92). During the March 2014 Cashflow College event, Defendant Will allegedly confirmed that his team was introduced to Impact Partnership through the President of Retirement Income Network. (*Id*. ¶ 93). JDM alleges that Defendant Fine visited Impact Partnership's website numerous times before he resigned from JDM and he caused some or all of his work product for JDM to be transferred to Impact Partnership and Will and that these Defendants along with Fine and the other individual Defendants are now using that proprietary work product and trade secret information. (*Id*. ¶¶ 94-96).

Defendant Fine, while still employed at JDM, allegedly conspired with Impact Partnership and Will to exploit his employment position to misappropriate JDM's trade secrets and confidential information for use in a competing venture that they owned and operated. (*Id*. ¶ 98). JDM further alleges that these and the other individual defendants acting in concert have used, and are using JDM's trade secrets and confidential information to further their own business interests. (*Id*. ¶¶ 99, 101, 103). JDM asserts that Defendants Impact, Fine and the other individual Defendants acting in concert have stolen "certain physical manifestations of Plaintiff's trade secrets and confidential information, including, but not limited to, those identified within the body of this Second Amended Complaint." (*Id*. ¶ 100). Plaintiffs allege that they have learned that Defendants Impact Partnership, Will and Fine formed JFI, LLC, ("JFI"), a Georgia limited liability company, to market and promote their Internet marketing portal for insurance and annuity agents and which was to be based on JDM's stolen trade secrets, including JDM's agent and client lists and the data removed from the JDM computer hard drive that Defendant Fine caused to be destroyed. (*Id*. ¶ 102).

1    JDM alleges based on information and belief that JFI is owned and operated by Defendants

2    Impact, Fine and Will, and that Impact, Fine and Will were at all relevant times agents,

3    principals, members and/or promoters of JFI.  (*Id*. ¶¶ 6-7).

4         JDM allegedly has learned that "Defendant JFI's competing www.annuityangel.com

5    website was purchasing AdWords and keywords identical in name, pattern, and volume to

6    the purchases" made by Defendant Fine when he worked for JDM.  (*Id*. ¶ 104).  JDM alleges

7    that it discovered on or about March 12, 2014 that JFI "was hosting an 'annuity angel

8    marketing program' and 'cashflow college' on March 18, 2014" at its Kennesaw, Georgia

9    offices which is the home office of Impact Partnership. (*Id*. ¶ 105).  The invitation to this

10   event included "a 'Subscriber Agreement' that contains two separate clauses" that

11   emphasized the confidential nature of the material being disseminated and imposed duties

12   of non-disclosure on subscribers, as set forth more particularly in the SAC.  (*Id*. ¶ 106). This

13   Subscriber Agreement further provided that any disclosure of JFI confidential information

14   would cause JFI irreparable harm and described JFI's "prospect lists" and "business and

15   marketing plans" as JFI's intellectual property.  (*Id*. ¶¶ 107-08).

16        JDM alleges that most or all of JFI's supposed "confidentiality information"

17   constitutes confidential and trade secret information of JDM that Defendants Will, Fine,

18   Arceo, Godinez, Latham and/or Uretz wrongfully misappropriated and which is being used

19   by Impact Partnership and the Defendants in their competing business venture.  (*Id*. ¶ 109).

20   The sales presentation at Defendants' Cashflow College event allegedly included formatting,

21   examples, vocabulary, and the outlining agenda that is almost identical to that of JDM's

22   exclusive Face-2-Face program and in some cases used the same JDM-created slides for

23   Face-2-Face.  (*Id*. ¶ 110). Defendant Fine at a Cashflow College event presented a

24   PowerPoint display that demonstrated Annuity Angel's Internet Marketing strategies using

25   JDM's Face-2-Face slides.  (*Id*. ¶ 111).  The Face-2-Face illustrations Defendant Fine used

26   during his presentation were located on the drive of his JDM computer prior to the computer

27   being reformatted at his request.  (*Id*. ¶ 112).  Defendant Fine allegedly stated during his

28   marketing presentation: "'So testing this out might be a risk for a small practice.  It's very

expensive to get off the ground and compete with the big players out there.'" (*Id*. ¶ 113). Defendant Fine during the March 2014 event stated that he had spent the previous six months building the Annuity Angel system, thereby indicating that he started the project in September 2013 when he was working at JDM and had access to JDM's resources.  (*Id*. ¶ 114).  JDM alleges that Defendant Fine, aided and abetted by and in concert with Impact Partnership and the other defendants, have solicited JDM employees and contracted agents in an effort to have them break their contracts with JDM and join Annuity Angel and Impact Partnership. (*Id*. ¶ 115).

Defendant John Steve Arceo worked as a Call Center Representative for JDM starting in March 2011 and executed a Confidentiality Agreement. (*Id*. ¶¶ 116, 121).  He also worked as an Inside Sales Representative before returning to his call center duties.  (*Id*. ¶ 117).  He stopped coming to work in August 2013 and his employment was terminated.  (*Id*. ¶¶ 118, 123).  Arceo's duties provided him with access to JDM's client information, client lists, call center metrics and client tracking system, the latter of which were developed at considerable expense.  (*Id*. ¶¶ 119-20).  He received proprietary sales training that included specific scripts, appointment processes, and sales techniques.  (*Id*. ¶¶ 120-21).

Before leaving JDM's employ, Arceo allegedly emailed to his personal email address JDM's call center sales metrics with sales and closing ratios, sales and appointment processes, client contact information, names and contact information for JDM employees, and client/appointment tracking system.  (*Id*. ¶ 124).  JDM refers to these items as "proprietary and confidential systems, processes, and sales metrics of JDM" valued at in excess of $1 million. (*Id*. ¶ 125). JDM alleges that in March 2014, Arceo moved to Georgia to work with Impact Partnership to help Impact replicate JDM's call center operations in conjunction with Will and Fine.  (*Id*. ¶ 126).  Arceo allegedly aided and abetted and acted in concert with Impact Partnership, Will and Fine in using JDM materials and techniques to teach advisors through Impact how to use JDM's proprietary sales processes, metrics and scripts.  (*Id*. ¶ 127). JDM asserts that Arceo "created a series of Annuity Angel webinars and videos to educate advisors on appointment processes and sales techniques" the content of

which parallels JDM's webinars created for the Face-2-Face program.  (*Id*. ¶ 132).  JDM alleges that Arceo while JDM's employee had access to all Face-2-Face materials  and upon information and belief, acted in concert with Impact and the individual defendants to use those materials to create Annuity Angel's advisor training program.  (*Id*. ¶ 132).  Arceo allegedly aided and abetted and acted in concert with Will, Fine and Impact Partnership to interfere with contractual relations by soliciting JDM employees and contracted agents to break their contract with JDM and join Annuity Angel.  (*Id*. ¶ 133).

Defendant Fernando Godinez worked for JDM as a Creative Programming Specialist and Marketing Manager between October 2011 and July 2013 and executed a Confidentiality Agreement.  (*Id*. ¶¶ 134, 140).  He submitted  his resignation on August 5, 2013.  (*Id*. ¶¶ 138, 141). Godinez allegedly had access to JDM's confidential and proprietary information based on responsibilities that included overseeing the design and implementation of advertising campaigns and media buys, measuring the monetary effectiveness of advertising per campaign, and tracking all consumer response and lead flow.  (*Id*. ¶ 139).  While still employed at JDM, Godinez allegedly collaborated with Defendants Will, Fine, Arceo and Uretz to copy JDM's sales and marketing programs with the intention of building JFI, d/b/a/ Annuity Angle, a competing company, and while acting in concert with those defendants, Godinez used copies of JDM's sales and marketing programs at JFI.  (*Id*. ¶¶ 142, 143).  JDM further alleges that while still JDM's employees, Godinez and Will together used JDM's resources during work hours on websites to attract other insurance clients, that Godinez contacted JDM's advertising vendors to assist in this effort, and that these activities enabled Will and Godinez to launch competing websites and advertising.  (*Id*. ¶ 144).  Defendant Godinez allegedly deleted files from his computer to hide his misconduct.  (*Id*. ¶ 146).  During the March 18, 2014 Cashflow College event, Godinez stated that he met with Will in July 2013 to create Annuity Angel; he also exposed JDM's trade secrets regarding Internet advertising and JDM's confidential information such as JDM's marketing budget.  (*Id*. ¶¶ 147, 149). JDM asserts  that Godinez took advantage of JDM resources to help develop and construct Annuity Angel.  (*Id*. ¶ 148).  Godinez has allegedly interfered with contractual

relations by soliciting JDM employees and contracted agents to break their contract with JDM and join Annuity Angel.  (*Id*. ¶ 150).

Defendant Patricia Latham became involved with JDM in the fall of 2009 to work as an assistant to Defendant Jovan Will.  (*Id*. ¶ 151).  Her last working day at JDM was July 26, 2013 when she was asked to leave.  (*Id*. ¶¶ 154-55).  Latham allegedly "had access to JDM's sales training pieces" and to confidential client lists.  (*Id*. ¶ 153).  JDM alleges that based on an analysis of Latham's computer and computer profiles, from July 23, 2013 through July 25, 2013, Latham created documents and spreadsheets that included JDM's confidential and propriety information, such as contact information for thousands of JDM clients, employees, advisors, vendors, partners, and contractors, and she deleted these documents from her computer to conceal her alleged misappropriation.  (*Id*. ¶¶ 156-57).  Latham also uploaded many of these and other documents and spreadsheets to her Google Drive and Dropbox account before leaving JDM.  (*Id*. ¶ 158).  JDM alleges that Latham possesses JDM confidential and proprietary information including client lists that have been used to solicit JDM employees and contracted agents and that she "provided the misappropriated data to Defendants Impact, Fine and Will, which was ultimately used to develop and construct Annuity Angel."  (*Id*. ¶ 159).

Defendant Carly Uretz was employed by JDM as a Content Specialist and Copywriter between September 2011 and September 2013.  (*Id*. ¶¶ 160, 162, 167).  As a Copywriter, Uretz was responsible for developing all advertising content and "became intimately familiar with the words, phrases, and usage of those words and phrases to generate the greatest consumer response."  (*Id*. ¶ 161).  JDM asserts that "[w]hile the copy that Defendant Uretz developed appeared in the public domain, the measured effectiveness of the copy is confidential and proprietary information."  (*Id*.).  She allegedly had access to confidential and proprietary information relative to JDM's marketing and sales funnels. (*Id*. ¶ 165).  After her employment termination, JDM learned that Uretz had sent confidential and proprietary materials from her JDM email to her personal email account and that these emails included "ongoing work projects, documentation of the JDM advisor recruiting process and initial

1   contact letter, contact information and pricing for third party vendors, non-public advertising

2   copy still in development, and advertising copy associated with third party vendors." (*Id*. ¶

3   168-69).   JDM alleges that Uretz acting in concert with Impact and the other individual

4   defendants has used or is using copies of its proprietary and confidential systems

5   information and advertising copy in the competing venture JFI d/b/a Annuity Angel. (*Id*. ¶

6   171).  Uretz also has allegedly collaborated with Impact and the other individual defendants

7   "to copy JDM's sales and marketing programs and use them" with JFI dba Annuity Angel.

8   (*Id*. ¶ 172).  JDM has allegedly learned from its current clients that Uretz in conjunction with

9   Defendant Fine has contacted JDM clients to recruit them to Impact Partnership using client

10   lists misappropriated by Defendant Latham.  (*Id*. ¶ 173).  During a May 18, 2014 Cashflow

11   College event, Uretz presented a PowerPoint presentation that demonstrated "the

12   methodology used by Annuity Angel to develop their marketing content" and that this "exact

13   formula has been used by JDM for years to develop marketing content and emails." (*Id*. ¶

14   176).  JDM asserts that "an analysis of Defendant Uretz' JDM work computer revealed

15   several JDM marketing documents outlining the same illustrations seen in Defendant Uretz'

16   PowerPoint slides." (*Id*.).

17   **III.    Discussion**

18        In the first part of its argument, Impact Partnership contends that JDM's claim for

19   misappropriation of trade secrets should be dismissed because JDM has not alleged in the

20   SAC any trade secrets and misappropriation by Impact Partnership.  Impact Partnership

21   specifically contends that (1) the SAC does not sufficiently allege facts showing that the

22   information allegedly misappropriated by Impact Partnership constitutes a "trade secret;" and

23   (2) JDM has not alleged in the SAC facts showing that Impact Partnership "'knew or had

24   reason to know that [its] knowledge of the trade secret was derived from or through a person

25   who had utilized improper means to acquire it'" (A.R.S, § 44-401(2)(b)(ii)), in part because

26   JFI is a separate legal entity from Impact Partnership. (MTD at 5-13).  Impact contends that

27   the SAC alleges merely that it entered into a business relationship with Plaintiffs' former

28   employees who may have misappropriated trade secrets and who may have used them on

JFI's behalf.  (MTD at 2).  In the second part of its argument, Impact Partnership contends that the remaining claims asserted against it should be dismissed because JDM has failed to allege facts in the SAC showing any wrongful conduct by Impact Partnership.  (*Id*. at 11-15).

In opposing dismissal, JDM contends that the SAC sufficiently alleges that Impact is using JDM's trade secrets and confidential information and that Impact knew or should have known that this protected information was improperly acquired.  (Resp. at 8-12).  JDM further argues that Impact Partnership cannot avoid liability on the ground that JFI is a separate legal entity.  (*Id*. at 12-13).  JDM opposes the dismissal of all claims asserted against Impact Partnership.

**A.  JDM's Misappropriation of Trade Secrets Claim Against Impact Partnership**

**1.     Plaintiffs' trade secrets and confidential information allegations in the SAC**

Impact Partnership contends that JDM has merely asserted in the SAC conclusory references such as "trade secrets," "confidential information," "proprietary work product," "physical manifestations," "materials and techniques," "misappropriated data," and "proprietary and confidential systems information," (MTD at 6, citing SAC ¶¶ 96, 98-101, 103, 109, 127, 159, 171, 188, 217), regarding the information that Impact Partnership allegedly misappropriated.  Impact Partnership argues that JDM has not sufficiently alleged that this information qualifies as a trade secret and that any allegations in the SAC that are more than bare conclusions "describe alleged conduct of the individual defendants and JFI." (*Id*.).  JDM  argues in response that "the trade secrets that the individual defendants misappropriated are the same trade secrets Impact misappropriated" and that the Court has already ruled that the allegations set forth in the First Amended Complaint ("FAC") describing trade secrets were sufficient.  (Resp. at 8).

In Arizona, who has adopted the Uniform Trade Secret Act ("AUTSA"), a trade secret is defined as "information, including a formula, pattern, compilation, program, device method, technique or process that both:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use.

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44-401(4).  In an action for misappropriation, the plaintiff "must identify the trade secrets and carry the burden of showing that they exist."  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993); *Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 para. 14 (Ariz. App. 2013).   The plaintiff is further required to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or special knowledge of those persons ... skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998).

In its previous ruling on various defendants' motions to dismiss, the Court noted that JDM had specifically identified in the FAC "'[t]he confidential information and trade secrets regarding JDM's sales and marketing funnels.'"  (Doc. 45, Report and Recommendation ("R&R") at 9; Doc. 53, Order adopting R&R).  These allegations from the FAC, set forth as follows, have been reasserted  in the SAC:

Pay per click advertising designed to convert views to website visits that has been put through a rigorous compliance process developed specifically for JDM for this type of product and industry.  Pay per click advertising must create a response based upon just a few key words or phrases.

(FAC ¶ 24(a); SAC ¶ 27(a)).

Knowing when and where to use pay per click advertising to increase consumer response and decrease advertising costs.  Incredible amounts of money can be wasted by advertising at the wrong place or time.  Knowing what words, word combinations, phrases, titles, topics on what websites or combination of websites at different times of the day, week, or month is critical.  This has taken JDM years to develop at tremendous expense –JDM has spent over $30 million on such advertising.

(FAC ¶ 24(b); SAC ¶ 27(b)).

E-mails designed to convert to website visits that have been put through a rigorous compliance process developed specifically for this type of product and industry.  Development includes knowing what copy to use in the subject line, what headlines to use, what copy to use for the body of the e-mail, and what calls to action to sue [sic].  If any one of these factors is missing or 'off,' then the entire e-mail may be ineffective.  Development also includes knowing what topics to use relative to current events and how to blend different topics for best response.

(FAC ¶ 24(c); SAC ¶ 27(c)).

> Knowing when and where to use e-mail advertising to increase consumer response and decrease advertising costs. E-mails must be sent to the right demographics, at the right time (relative to time of day, current events, and days of the week also taking into account holidays). This has also taken years to develop at great expense.

(FAC ¶ 24(d); SAC ¶ 27(d)).

> Website landing pages [of which] ... [c]ritical components include specific words, phrases, titles, topics, and videos as well as almost innumerable combinations of them. Each component has been tested and tracked to determine what gets the best response from consumers taking into account variables such at [sic] what e-mails and pay per click ads they are used in conjunction with.

(FAC ¶ 24(e); SAC ¶ 27(e)).

> ... Call center staffing and activity [which] must be closely coordinated to the current advertising volume and message. All aspects of call center performance have been tracked and measured to improve performance including call response times, time of day clients called, number of time clients called, frequency of client calls, coordinating client calls with e-mails and timing of appointments set.

(FAC ¶ 24(f); SAC ¶ 27(f)).

> Training for financial advisors that teaches them JDM's sales process, including specific messaging for each appointment with the client. Critical aspects include what to say to clients under different circumstances, at what stage in the sale process to introduce different concepts, income planning to maximize value to the client, and the psychology of annuity buyers.

(FAC ¶ 24(j); SAC ¶ 27(j); *see also* FAC, ¶¶ 24(g)-(h) and (k); SAC ¶¶ 27(g)-(h) and (k) (regarding sales processes and training techniques)). JDM has alleged facts showing economic advantage and protection of its trade secrets and confidential information. (SAC ¶¶ 30-37).

After noting that JDM had asserted that the individual Defendants Will, Fine, Godinez, and Uretz had misappropriated the physical manifestations of trade secrets (Doc. 45, R&R at 10 & Doc. 53, Order adopting R&R), the Court found as to each of these defendants that JDM's allegations in the FAC set forth sufficient facts to support JDM's claim that trade secrets are at issue. (Doc. 45, R&R at 12-13, 17, 19; Doc. 53, Order at 10-11). This included allegations now reasserted in the SAC that Defendant Will had access to confidential client and marketing lists (*see* SAC ¶ 45); the destruction of the body of work

that Defendant Fine had performed for JDM over a three-year period, "including spreadsheets that documented the relative cost-effectiveness and profitability of all of JDM's historical ADWords marketing, including information such as cost per click, cost per lead conversion, cost per appointment, average size of policy generated, revenue per key word per marketing channel, and profit per key word per marketing channel" (*see Id*. ¶ 78); Defendant Fine's misappropriation of JDM's trade secrets, including but not limited to its Internet advertising data  (*see Id*. ¶ 87); Defendant Godinez' alleged access to JDM "confidential and proprietary information" regarding his responsibilities in overseeing "the design and implementation of advertising campaigns and media buys ... and measuring the effectiveness of money spent on advertising per campaign and track[ing] all consumer response and lead flow;" and he collaborated with other defendants to copy JDM's sales and marketing programs (*see Id*. ¶¶ 139, 142); and, Defendant Uretz' email to her personal account of confidential and proprietary information that "included ongoing work projects, documentation of the JDM advisor recruiting process and initial contact letter, contact information and pricing for third party vendors, non-public advertising copy still in development, and advertising copy associated with third party vendors." (*see Id*. ¶¶ 168-69). JDM has also alleged that Defendant Arceo while at JDM had access to client information, client lists, call center sales metrics and client tracking systems and that regarding his employment roles he received "proprietary sales training" that included "specific scripts, appointment processes, and sales techniques." (SAC ¶¶ 119-120).   Arceo executed a Confidentiality Agreement and sent to his personal email proprietary and confidential systems, processes, and sales metrics of JDM valued at in excess of $1 million. (*Id*. ¶¶ 121, 124-25).

The Court will not further revisit the trade secrets issue as argued by Impact.  The Magistrate Judge recommends the finding, as JDM argues, that the trade secrets that the individual defendants allegedly misappropriated are the same trade secrets Impact allegedly misappropriated.

//

### 2. Whether JDM has sufficiently alleged in the SAC the Misappropriation claim against Impact Partnership

In Arizona, "misappropriation" is defined as either:

(a)    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(b)    Disclosure or use of a trade secret of another without express or implied consent by a person who either:

(I) Used improper means to acquire knowledge of the trade secret.

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

A.R.S. § 44-401(2).

"Improper means" is defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." A.R.S. § 44-401(1). The parties' briefing focuses on whether the SAC has sufficiently alleged facts showing that Impact Partnership knew or had reason to know that it was using trade secrets acquired by improper means. (MTD at 8; Resp. at 8).

### (a) The parties' arguments

Impact Partnership refers to the following of the SAC's allegations in support of its argument that the misappropriation claim has not been sufficiently supported with actual circumstances. Defendants Impact Partnership, Will and Fine formed a competing company known as JFI, a Georgia limited liability company, JFI launched web sites "very similar" to Mellberg Financial websites, including www.annuityangel.com and www.thecashflowcollege.com, and that JFI "dba as Annuity Angel" created webinars, videos, and an advisor training program similar to those created by Mellberg Financial for its potential customers. (MTD at 3, citing SAC ¶¶ 28, 62, 102, 132, 143, 171). On March 18, 2014, JFI hosted an "annuity angel marketing program" and "cashflow college" at Impact Partnership's home office and during these events the individual defendants purportedly gave a sales presentation "almost identical" to the "Face-2-Face" marketing program Mellberg

1   Financial presents to potential customers.  (MTD at 3-4, citing SAC ¶¶ 105, 110, 111).  JFI

2   sent out a "subscriber agreement" that emphasized the confidential nature of the material that

3   would be disseminated at the event and imposed duties of non-disclosure on attendees, and

4   JFI's "supposed 'confidentiality information' constitutes confidential and trade secret

5   information of JDM."  (MTD at 4, n.3 (citing SAC ¶¶ 106-09).  Defendant Arceo created

6   webinars and videos for JFI that parallel "JDM's webinars created for the Face-2-Face

7   program" and  Defendant Fine gave a presentation on behalf of JFI "using JDM Face-2-Face

8   [PowerPoint] slides."  (MTD at 6-7, citing SAC ¶¶ 111, 132).  Impact Partnership points out

9   that JDM admits that it uses the Face-2-Face advisor training program as a recruiting tool for

10  potential customers and contends therefore that such materials are not "secret."  (MTD at 7,

11  citing SAC ¶ 28).

12          Defendant Impact refers to the following SAC allegations that it construes as legal

13  conclusions:

14          Defendant Impact, acting in concert with Defendants Will and Fine and the
            other Individual Defendants, have used, and are using, JDM's trade secrets and
15          confidential information to further their own business interest (SAC ¶ 99);

16          Upon information and belief, Defendants Impact, Tree, and Fine, and the other
            Individual Defendants, acting in concert, have stolen from Plaintiff certain
17          physical manifestations of Plaintiff's trade secrets and confidential
            information, but not limited to, those identified within the body of this Second
18          Amended Complaint (SAC ¶ 100);

19          Defendant Impact, acting in concert with Defendants Tree and Fine and the
            other Individual Defendants, have used, and are using, JDM's confidential
20          information and trade secrets for the benefit of themselves as competitors of
            JDM (SAC ¶ 101); and,
21
            The Individual Defendants, aided and abetted by, and in concert with, Impact,
22          have also unfairly competed against JDM by misappropriating JDM
            Confidential Information, including Confidential Information that does not rise
23          to the level of a trade secret under A.R.S. § 44-401 (SAC ¶ 198).

24
    (MTD at 4).  Impact Partnership contends that these allegations in the SAC describe alleged
25
    conduct of the individual defendants and JFI, but not Impact Partnership. It argues that JFI
26
    is a separate legal entity and not a party to the lawsuit.  (MTD at 10).
27

28

1    In response, JDM asserts that its theory of the case is that Impact and the individual

2 defendants "hatched" a scheme whereby JDM's former employees stole JDM's trade secrets,

3 provided them to Impact, and Impact is now using those trade secrets under circumstances

4 where it knows, or should know, that the trade secrets were wrongfully acquired. (Resp. at

5 8). JDM contends that it does not need to allege that Impact Partnership itself stole the trade

6 secrets; it is enough to allege that Impact is improperly using them and that it knows or has

7 reason to know the trade secrets were acquired by improper means. (*Id.*). JDM argues that

8 the SAC sufficiently alleges that Impact is using JDM's confidential information and trade

9 secrets both at Impact Partnership and through JFI which was established by Defendants

10 Impact, Will, and Fine to lure agents to Impact. (*Id.* at 9).

11    JDM points to certain allegations in the SAC in contending that the misappropriation

12 claim has been sufficiently pleaded, including:

13    Impact separately from JFI is using JDM's confidential information and trade secrets
     in Impact's call center which was developed by JDM's former employees using
14    JDM's trade secrets; this information included "JDM's call center sales metrics with
     sales and closing ratios, sales and appointment processes, client contact information,
15    names and contact information for other JDM employees, and client/appointment
     tracking system." (Resp. at 9, citing SAC ¶¶ 124-27). JDM cites *PMC, Inc. v.*
16    *Kadisha*, 78 Cal. App. 4th 1368, 1383, 93 Cal. Rptr. 2d 663, 675 (2000), for the
     proposition that "misappropriation is not limited to the initial act of improperly
17    acquiring trade secrets; the use and continuing use of the trade secrets is also
     misappropriation."
18
     Defendant Arceo stole JDM's protected materials and then moved to Georgia to work
19    with Impact to help Impact replicate JDM's call center operations (Resp. at 9, citing
     SAC ¶¶ 124-26). Defendant Arceo is using JDM's materials and techniques to teach
20    Impact's advisors how to use JDM proprietary sales processes, metrics, and scripts.
     (Resp. at 9, citing SAC ¶ 127). Citing *Amedisys Holding, LLC v. Interim Healthcare*
21    *of Atlanta, Inc.*, 793 F. Supp. 2d 1302, 1313 (N.D. Ga. 2011), and *Phoenix Children's*
     *Hosp., Inc. v. Grant*, 265 P.3d 417, 422 (Ariz. App. 2011), JDM contends that
22    because Defendant Arceo used the stolen trade secrets in the course and scope of his
     work for Impact, Arceo's knowledge that the trade secrets used to develop Impact's
23    call center were improperly acquired is imputed to Impact. (Resp. at 9).

24    The marketing and training materials and strategies presented at the Cashflow College
     event were virtually identical to JDM's exclusive Face-2-Face program and
25    Defendant Fine stated at the event, "So testing this out might be a risk for a small
     practice. It's very expensive to get off the ground and compete with the big players
26    out there." (Resp. at 11, citing SAC ¶¶ 109-11, 113).

27    With respect to Impact Partnership's argument that JDM's Face-2-Face program is
     not a trade secret, JDM points to Impact's representation that its duplicative program
28    contains confidential intellectual property and that each prospective agent at the

Cashflow College was required to execute a confidentiality agreement as a condition of entry to the presentation. (Resp. at 11, citing SAC ¶¶ 35, 106-09). JDM points out that the Face-2-Face program is "an advisor training program ... for prospective agents" (Resp. at 11, citing SAC ¶ 28), and that the Court has found that JDM's "training materials" are sufficiently alleged to be trade secrets (Resp. at 12, citing Doc. 53, Order).

Defendants Impact and Will, not through JFI, used, or are using JDM's client lists that were misappropriated by Will (Resp. at 10, citing SAC ¶¶ 60-61), which by itself demonstrates joint misappropriation based on *Morlife, Inc. v. Perry*, 56 Cal. App.4th 1514, 1523 (1997), and the Court stated in the Report and Recommendation that "[t]rade secret protection can extend to client lists." (Resp. at 10, n.4, citing Doc. 45, R & R at 15).

Defendant Impact received a cease and desist letter in February 2014 demanding that it stop using JDM's client lists. (Resp. at 10, citing SAC ¶ 61).

Defendant Will approached Impact with a proposal to launch a web-based marketing program for insurance and annuity agents that would mirror and compete with JDM's highly successful programs. (Resp. at 5, citing SAC ¶¶ 61, 88).

Defendant Fine worked on projects for Impact while still employed at JDM and transferred JDM work product to Impact. (Resp. at 5, citing SAC ¶¶ 90, 96).

JFI, the entity that houses the Cashflow College and Annuity Angel programs that utilize JDM's trade secrets, is an instrumentality of the conspiracy to misappropriate and is specifically designed to attract potential agents to Impact. (Resp. at 7, citing SAC ¶ 98).

JDM argues that Impact and the individual Defendants were able to get the Cashflow College off the ground mere months after JDM's employees left JDM to join Impact, a task that would have been virtually impossible without JDM's stolen trade secrets. (Resp. at 11). JDM contends that based on the allegations of the SAC and the reasonable inferences to be drawn from those allegations when viewed in the light most favorable to Plaintiffs, the SAC sufficiently alleges that Impact "'knew or had reason to know that [its] knowledge of the trade secret[s] was' either: (1) '[d]erived from or through a person who had utilized improper means to acquire it;' (2) '[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;' or (3) '[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use ...,'" citing A.R.S. § 44-401. (Resp. at 12).

With respect to Impact's argument regarding JFI, JDM clarifies that it is not alleging that Impact is vicariously liable for the trade secrets misappropriation based on its status as

- 19 -

1   a member and operator of JFI; rather, "Impact is alleged to have directly participated in a

2   conspiracy to steal JDM's trade secrets, to have used JDM's trade secrets in the Impact

3   Partnership, and to have created and used JFI as an instrument for carrying out further

4   misappropriation." (Resp. at 13, referring to SAC ¶¶ 60-61, 98, 102, 126).

5           **(b) Analysis**

6           The Court has considered the allegations in the SAC and the parties' arguments.

7   Considered in the light most favorable to Plaintiffs, the SAC alleges facts sufficient to show

8   that Impact Partnership knew, or had reason to know, that it was using JDM's trade secrets

9   that had been acquired by improper means. Defendants Will, Fine, Arceo, Godinez, Latham

10  and Uretz all worked for or were associated with JDM and occupied positions that gave them

11  access to JDM's confidential and proprietary business methods, techniques and programs

12  related to marketing, advertising, sales and training that had been developed over the years

13  at considerable expense, including alleged trade secrets. (SAC ¶¶ 38- 40, 44-45, 74-75, 116,

14  118, 123-25, 134, 138-41, 151, 154-59, 160-62, 165, 167-69). It is alleged that Defendants

15  such as Fine, Arceo, Godinez and Latham executed Confidentiality Agreements while

16  working for JDM. (*Id*. ¶¶ 36b, 76, 121, 140). As of January 2014, Defendant Will had

17  allegedly approached Impact Partnership about "launch[ing] a web-based lead program that

18  *mirrors* the JDM program." (*Id*. ¶ 60 (emphasis added)). JDM learned this from Advisors

19  Excel, a JDM product partner/vendor whose agents and clients had received marketing

20  regarding the lead program. (*Id*.). By February 2014, Defendants Will and Fine allegedly

21  had associated themselves with Impact Partnership and these three defendants "were in the

22  process of launching an Internet marketing portal for insurance and annuity agents that would

23  compete directly with JDM's Internet marketing portal." (*Id*. ¶ 88). Also as of February

24  2014, Defendant Will acting either individually or in concert with Impact Partnership, Fine,

25  Godinez, Uretz and Arceo allegedly had launched the www.annuityangel.com and

26  www.thecashflowcollege.com websites which are similar to JDM's websites. (*Id*. ¶ 62).

27          Between the time that the individual Defendants left their association with JDM as of

28  November 2013 and the Cashflow College event in March 2014, the competing venture had

1    become operational as based in part on its use of the information the individual Defendants

2    had allegedly taken from JDM.  Defendant Will had access to JDM's confidential client and

3    marketing lists and Defendant Fine was responsible for the purchase of JDM's web-based

4    advertising based on AdWords and key words.  (*Id*. ¶¶ 44-45, 75).  Defendant Fine while at

5    JDM allegedly visited Impact Partnership's website many times, he worked on projects for

6    Impact Partnership, he transferred some or all of his work product to Impact Partnership and

7    Will, and he caused forensic wipes of his JDM computer devices.  (*Id*. ¶¶ 86, 90, 94-96).  The

8    Annuity Angel website has purchased and is purchasing AdWords and keywords identical

9    in name, pattern, and volume as the purchases Defendant Fine made while at JDM.  (*Id*. ¶¶

10   64, 104).  Defendant Godinez while at JDM had access to confidential and proprietary

11   information regarding advertising methods and techniques and in tracking consumer response

12   and lead flow and he deleted files from his computer.  (*Id*. ¶¶ 139, 146). Defendants Godinez

13   and Will while employed at JDM together used JDM's resources on various websites to

14   attract other insurance clients and Godinez contacted JDM's advertising vendors, all of

15   which enabled these two defendants to launch websites and advertising that competed with

16   JDM.  (*Id*. ¶ 144).

17          Defendant Latham "had access to JDM's sales training pieces" and confidential client

18   lists.  (*Id*. ¶ 153).  Latham created on her JDM computer documents and spreadsheets that

19   consisted of JDM's confidential and proprietary contact information and then deleted the

20   information from her computer before leaving JDM.  (*Id*. ¶¶ 156-58).  Defendant Latham

21   allegedly has provided to Defendants Impact Partnership, Fine and Will the JDM

22   confidential and proprietary information for use in developing and constructing Annuity

23   Angel. (*Id*. ¶ 159). Defendant Uretz while at JDM developed advertising content and became

24   "intimately familiar with the words, phrases, and usage of those words and phrases to

25   generate the greatest consumer response." (*Id*. ¶ 161).  Defendant Uretz allegedly acting in

26   concert with Impact and the other individual defendants has used or is using copies of JDM's

27   proprietary and confidential systems information and advertising copy in the competing

28   venture JFI d/b/a Annuity Angel.  (*Id*. ¶ 171).  Defendants Uretz and Fine allegedly have

1  contacted JDM clients to recruit them to Impact using client lists misappropriated by Latham.

2  (*Id.* 173).

3     Defendant Arceo while at JDM had access to JDM's client information and lists and

4  allegedly emailed to his personal email address JDM's call center sales metrics and related

5  information which Plaintiffs allege is "proprietary and confidential systems, processes, and

6  sales metrics of JDM" valued at more than $1 million. (*Id.* ¶¶ 119, 124-25). Arceo allegedly

7  moved to Georgia to work with Impact Partnership to assist Impact in replicating JDM's call

8  center operations along with Defendants Will and Fine. (*Id.* ¶ 126). Arceo allegedly has

9  aided and abetted and acted in concert with Defendants Impact Partnership, Will and Fine

10 in using JDM's materials and techniques to teach advisors through Impact how to use JDM's

11 proprietary sales processes, metrics and scripts. (*Id.* ¶ 127). Arceo has allegedly "created

12 a series of annuity angel webinars and videos to educate advisors on appointment processes

13 and sales techniques." The content in these videos "parallels JDM's webinars created for the

14 Face-2-Face program." (*Id.* ¶ 132). Arceo while at JDM allegedly had access to the Face-2-

15 Face materials and allegedly has acted in concert with Impact Partnership and the individual

16 defendants to use those materials to create the annuity angel advisor training program. (*Id.*

17 ¶ 132).[2]

18

19        [2] Impact Partnership argues that the Face-2-Face program is not a trade secret because

20 Plaintiffs use it as a recruiting tool for potential customers. (MTD at 7). JDM contends that
   Face-2-Face is an "advisor training program ... for prospective agents" and the Court has

21 ruled that JDM's "training materials" are sufficiently alleged to be trade secrets. (Resp. at 11-
   12). *See Enter. Leasing Co. v. Ehmke*, 3 P.3d 1064, 1079 (Ariz. App. 1999) ("a trade secret

22 may include a grouping in which the components are in the public domain but there has been
   accomplished an effective, successful and valuable integration of those public elements such

23 that the owner derives a competitive advantage from it"). "Whether a trade secret exists is
   a mixed question of law and fact." *Calisi*, 302 P.3d at 631.

24
          JDM relies on *Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.*, 793

25 F. Supp. 2d 1302 (N.D. Ga. 2011), in support of the argument that Arceo's knowledge that
   the trade secrets used to develop Impact's call center were improperly acquired is imputed

26 to Impact. (Resp., at 9). JDM cites *Phoenix Children's Hospital, Inc. v. Grant*, 265 P.3d

27 417, 422 (Ariz. App. 2011), for "the general rule that knowledge of an employee is imputed
   to the employer." (Resp. at 10). The Ninth Circuit has noted, however,  that "it is generally

28

1    JDM alleges that Defendant Impact Partnership, along with Defendants Will and Fine,

2    formed JFI to market and promote their Internet marketing portal for insurance and annuity

3    agents based on JDM's stolen trade secrets, including JDM's agent and client lists

4    (Defendant Will had access to client lists) and the data Defendant Fine removed from his

5    JDM computer.  (*Id*. ¶ 102).  JDM alleges, based on information and belief, that Defendant

6    Impact Partnership, along with Defendants Fine and Will, own and operate JFI.  (*Id*. ¶¶ 6-7).

7    Defendant Will allegedly developed and hosted a "cashflow college" event on  March 18,

8    2014.  (*Id*. ¶ 66).  Elsewhere in the SAC, JDM alleges it learned on or about March 12, 2014

9    that JFI "was hosting an 'annuity angel marketing program' and 'cashflow college'" on

10   March 18, 2014 at JFI's Kennesaw, Georgia offices which is also Impact Partnership's home

11   office address. (*Id*. ¶ 105).

12        A Cashflow College sales presentation associated with Defendant Will includes

13   formatting, examples, vocabulary, and outlining agenda "almost identical" to "JDM's

14   customized Face-2-Face program" and the same slides JDM created for Face-2-Face.  (*Id*.

15   ¶¶ 69, 110).  Defendant Fine at a Cashflow College event demonstrated Annuity Angel's

16   Internet Marketing strategies using JDM's Face-2-Face slides to which he had access while

17   working at JDM.  (*Id*. ¶¶  111-12).  Defendant Godinez commented at the March 2014

18   Cashflow College event that he met with Defendant Will in July 2013 to create Annuity

19   Angel, indicating this would have occurred while both were associated with JDM.  (*Id*. ¶¶

20   147-48).  Godinez also revealed JDM's trade secrets regarding Internet advertising and JDM

21   confidential information such as JDM's marketing budget.  (*Id*. ¶¶ 147, 149).  Defendant

22   Uretz at a May 2014 Cashflow College event demonstrated "the methodology used by

23   Annuity Angel to develop their marketing content" which is allegedly the "exact formula"

24   JDM had used to develop marketing content and emails.  (*Id*. ¶ 176).  Invitations to the

25

26   not appropriate to direct a jury to impute an agent's knowledge of a secret to the principal"
27   because "such an instruction would permit recovery even when the trade secret was not
     actually communicated to or used by the principal." *Droeger v. Welsh Sporting Goods*
28   *Corp.*, 541 F.2d 790, 792-93 (9th Cir. 1976).

1    Cashflow College event included a "Subscriber Agreement" that emphasized the

2    confidentiality of the materials being disseminated and imposed duties of non-disclosure on

3    subscribers.  (*Id*. ¶ 106).[3]

4          As discussed in *Lumenate Technologies, LLC v. Integrated Data Storage, LLC*, Case

5    No. 13 C 3767, 2013 WL 5974731 (N.D. Ill. Nov. 11, 2013), the plaintiff may rely on

6    circumstantial evidence to prove misappropriation of trade secrets:

7                 Courts ... have repeatedly recognized that plaintiffs in trade secret cases
             can rarely prove misappropriation by convincing direct evidence. *See*
8            *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *15 (N.D. Ill.
             Jan. 2, 1996). 'In most cases, plaintiffs ... must construct a web of perhaps
9            ambiguous circumstantial evidence from which the trier of fact may draw
             inferences which convince him that it is more probable than not that what
10           plaintiffs allege did in fact take place.' *Id.* (quoting *Si Handling Sys., Inc. v.*
             *Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985)); ...

11   *Lumenate*, 2013 WL 5974731, at *5.

12         Similarly, JDM in the instant case has alleged in the SAC a "web" of factual

13   allegations that "plausibly give rise to an entitlement to relief" that Impact Partnership knew,

14   or had reason to know, that it was using JDM's trade secrets that had been acquired by

15   improper means. Through discovery JDM  may be able to gain evidence regarding Impact

16   Partnership's unlawful activity to more fully support the misappropriation claim.  Although

17   JDM may not ultimately be able to prove its allegations, at this stage of the proceedings JDM

18   has  alleged facts in the SAC sufficient to state a claim for relief.

19   //

20   //

21

22

23         [3]  JDM contends that the Subscriber Agreement attached to the SAC "mandates that

24   in exchange for the use of JFI's materials, which are comprised of JDM's stolen trade secrets,
     the agent must transfer all business to Impact." (Resp. at 7, SAC, Ex. 3 Subscriber

25   Agreement ¶ 3.5).

26         The Court has not included in the recited allegations the alleged February 2014 cease
     and desist letter.  (Resp. at 7).  It is alleged in the SAC that "In February 2014, Advisors

27   Excel's counsel sent a letter to Impact and Will demanding that they stop using their client
     list that Will obtained while working for JDM."  (SAC ¶ 61).  The SAC does not allege that

28   this cease and desist letter was sent by JDM.

**B.**    **JDM's Remaining Claims for Unfair Competition, Civil Conspiracy and Aiding and Abetting**

Defendant Impact argues that JDM has not alleged any facts showing wrongdoing by Impact Partnership that could support its remaining claims. (MTD at 11).  Impact contends that in the twenty-one paragraphs of allegations in support of Count Three (Unfair Competition), Count Nine (Civil Conspiracy), and Count Ten (Aiding and Abetting), JDM mentions Impact Partnership only twice and in conclusory fashion.  (MTD at 12, citing SAC ¶¶ 198 & 206). Impact argues that JDM relies almost entirely on allegations asserted against the Defendants collectively and makes no attempt to identify any alleged conduct attributable to Impact Partnership (referring to SAC ¶¶ 200, 202-05, 237-38, 240, 242-45).  JDM argues in response that the SAC sufficiently asserts factual allegations in support of these claims and refers to certain numbered paragraphs of the SAC.  (Resp. at 14-15, citing SAC ¶¶ 61, 88, 90, 94, 102, 159, 168-69, 173, 176).

In each of the three remaining claims, JDM has alleged that "JDM incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth herein."  (SAC ¶¶ 196,  236, 241).  In support of the Civil Conspiracy claim, JDM  alleges that "Upon information and belief, Defendants willfully, intentionally, and knowingly agreed and conspired with each other to engage in the alleged wrongful conduct, including Defendants' misappropriation of trade secrets and other unfair business practices."  (*Id*. ¶¶ 237).  In support of the Aiding and Abetting claim, JDM alleges that "As fully described above, Defendants had full knowledge, or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including misappropriation of JDM's trade secrets and confidential information and other unfair business practices, by providing substantial assistance and/or encouraging others to act" and "by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself."  (*Id*. ¶¶ 242-43).  Elsewhere in the SAC, JDM has asserted allegations that identified defendants have aided and abetted one

another or conspired with one another, including Impact Partnership, in the context of specific factual allegations.

"Claims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach." *Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons*, 38 P.3d 12, 23 (2002). "[L]iability for civil conspiracy requires that two or more individuals agree and thereupon accomplish 'an underlying tort which the alleged conspirators agreed to commit.'" *Id*. (quoting *Baker v. Stewart Title & Trust of Phoenix*, 5 P.3d 249, 259 (App. 2000)).

The Magistrate Judge has recommended the finding that JDM has sufficiently alleged a claim for misappropriation of trade secrets against Defendant Impact Partnership. Moreover, Plaintiffs were allowed to "amend the claim of unfair competition based on misappropriation of confidential information that is not a trade secret." (Doc. 53, Order at 7). JDM states in its response that it has pleaded the Unfair Competition claim "in the alternative to the misappropriation claim in the event it is determined that the confidential information improperly acquired by Impact and the individual defendants does not rise to the level of a trade secret under A.R.S. § 44-401." (Resp. at 17). Defendant Impact Partnership has not persuasively argued that the remaining claims should be dismissed because JDM has not sufficiently pleaded those claims or sufficiently alleged wrongdoing by Impact Partnership. The Magistrate Judge recommends that JDM's three remaining claims should not be dismissed.

**IV. Recommendation**

Based on the foregoing reasons, the Magistrate Judge recommends that the District Court after its independent review deny Defendant The Impact Partnership's Motion to Dismiss the Second Amended Complaint (Doc. 55).

Pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the Federal Rules of Civil Procedure and LRCiv 7.2(e) of the Rules of Practice of the U.S. District Court for the District of Arizona, any party may serve and file written objections within **Fourteen (14) Days** after being served with a copy of this Report and Recommendation.  A party may respond to another party's objections within **Fourteen (14) Days** after being served with a copy. Fed.R.Civ.P. 72(b)(2).  No replies to objections shall be filed unless leave is granted from the District Court to do so.  If objections are filed, the parties should use the following case number: **CV-14-02025-TUC-CKJ**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may be deemed a waiver of the party's right to de novo review of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).

DATED this 22nd day of January, 2016.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**

- 27 -