**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joshua David Mellberg LLC, et al., | No. CV-14-02025-TUC-CKJ (LCK) |
| Plaintiffs, | **ORDER** |
| v. | |
| Jovan Will, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion to Exclude Plaintiffs' Untimely Damages Evidence. (Doc. 310). Plaintiffs filed a response (Doc. 317) and Defendants a reply (Doc. 322). Oral argument was held on February 6, 2019. (Doc. 390).

## Background

Joshua David Mellberg, LLC ("JDM") is a financial advisory firm. Throughout the years, JDM developed numerous confidential and proprietary business practices and trade secrets. JDM takes significant measures to protect that confidential information and has a policy that requires all employees to return any physical embodiments of confidential information and trade secrets to JDM upon the termination of their employment. JDM alleges that the Defendants, former employees of JDM, misappropriated JDM's confidential information and caused JDM significant financial damages.

In August 2015, Plaintiffs submitted their initial disclosure statement ("August 2015 Disclosure") indicating they were seeking over $85,000,000.00 in damages in connection with their underlying claims. (Doc. 317, pg. 2). In that disclosure, Plaintiffs identified

eleven categories of damages, with lump-sum estimates for eight of the categories but provided no computations to support those estimates. (Doc. 310, pg. 5). Two months before the May 2017 expert witness deadline, Plaintiffs disclosed Lynton Kotzin ("Mr. Kotzin"), as their damages expert. Mr. Kotzin produced an expert report (the "Kotzin Report") pursuant to Rule 26(a)(2)(B) which estimated that if liability were found, the amount of economic damages to JDM would be $16,340,000.00. This figure reflected Mr. Kotzin's estimation of two categories of damages: lost profits and a diminution of JDM's company value.

On June 12, 2018, Plaintiffs disclosed that their interim CFO, Paul Crooks ("Mr. Crooks"), would present a new cost-based damages methodology via a supplemental disclosure statement. Mr. Crooks began his employment with JDM as a consultant in finance and operations in January 2017 and transitioned into JDM's interim Chief Financial Officer in the Summer of 2017. He stayed in that role until July 2018, when a full-time CFO was hired. (Doc. 327-3, pg. 9). In September 2018, Plaintiffs disclosed Mr. Crooks's supplemental disclosure statement. ("September 2018 Disclosure"). That disclosure statement included calculations prepared by Mr. Crooks and largely based loss amounts on a theory of unjust enrichment with an actual total loss amount of $107,310,000.00.

On October 12, 2018, Defendants filed a Motion to Exclude Plaintiffs' Untimely Damages Evidence. (Doc. 310). Specifically, Defendants argue: (1) Mr. Crooks is an expert witness in lay witness clothing; (2) Mr. Crooks is an expert witness and was not timely disclosed; and (3) Mr. Crooks's testimony should be excluded.

## **Analysis**

1. *Is Mr. Crooks's Testimony Lay Testimony or Expert Testimony?*

Federal Rule of Evidence 701 governs lay opinion testimony and provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Fed. R. Evid. 701 (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). "[T]he mandate of Rule 701 is clear. Lay opinion testimony is 'not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.'" *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. 597, 2006 WL 1330002, at *3 (N.D. Cal. May 15, 2006) (quoting *U.S. v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002)).

Mr. Crooks's testimony can be properly admitted under Rule 701 only if it is: (1) based upon his personal knowledge of JDM and (2) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. The Court will examine each requirement separately.

*A. Personal Knowledge*

Rule 701 requires that Mr. Crooks's testimony be "rationally based on [his] perception." Defendants take an overly expansive view of the personal knowledge component in Rule 701, claiming that since Mr. Crooks was not employed at JDM from 2010 through 2013, and his damages analysis is based on information, documents, and statements from 2010 through 2013, he does not satisfy the personal knowledge requirement. *See* (Doc. 310, pg. 7) ("Crooks' damages analysis is based on information from 2010 through 2013. But he did not perform any services for JDM until January 2017 and admits that he has no personal knowledge of events at JDM before then.") (internal citation omitted).

The personal knowledge requirement in Rule 701 is not a requirement that a witness be personally present or involved in every interaction that he or she is testifying to. *See United States v. Gadson,* 763 F.3d 1189, 1209 (9th Cir. 2014) (district court's decision to permit witness to testify based upon his knowledge of the case, including information contributed by others "rather than merely his personal observations" was not erroneous).

Personal knowledge is also not knowledge that a witness possesses only if it is a party to an event. Even though Mr. Crooks was not employed with JDM from 2010 through 2013, if he is familiar with JDM's financial records due to his employment with JDM, he will have met the personal knowledge requirement even if the documents that he is reviewing were prepared by other employees. *See Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1193 (D.N.J. 1992), aff'd, 4 F.3d 1153 (3d Cir. 1993) ("It is logical that in preparing a damages report the author may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under Fed.R.Evid. 701."). Defendants' interpretation would create unnecessarily limited scenarios where only employees who were actively employed and involved in the creation of a document would be allowed to testify regarding its contents.

Courts have previously held that corporate executives can possess the particularized knowledge of a corporation's financial data enabling them to testify as a lay witness. *See Nevada Rest. Serv., Inc. v. City of Las Vegas*, No. 215CV02240GMNGWF, 2018 WL 3973402, at *4 (D. Nev. Aug. 20, 2018) (court permitting CFO to provide lay testimony about corporation's damages because CFO, "by virtue of his position in the company . . . has particularized knowledge of Plaintiff's financial data"); *Hot Stuff Foods, LLC v. Houston Cas. Co.*, 771 F.3d 1071, 1079 (8th Cir. 2014) (holding that district court did not abuse discretion in admitting company's president and former CFO's lay testimony on damages due to his "intimate knowledge of [company] operations"); *Lativafter Liquidating Tr. v. Clear Channel Commc'ns, Inc.*, 345 F. App'x 46, 51 (6th Cir. 2009) (finding that district court did not abuse discretion by permitting an investor who researched a company's financial condition and later served as a member of the company's board to provide lay testimony about the company's projected value because he "had personal, particularized knowledge" of the company's value).

However, although Mr. Crooks was employed at JDM, the extent of Mr. Crooks's personal knowledge of JDM's finances is unclear. Mr. Crooks began his employment with JDM as a consultant in finance and operations in January 2017 and became JDM's interim

CFO in July 2017. By July 2018, a full-time CFO was hired and Mr. Crooks stepped down from that position and transitioned to a new role as president of Mellberg Wealth Management, an LLC jointly owned by Mr. Crooks and JDM. (Doc. 327-4, pg. 8). Therefore, Mr. Crooks was only employed with JDM for a period of approximately one and one-half years. However, even while Mr. Crooks served as JDM's interim CFO, it appears that he was nothing more than a part-time employee. Mr. Crooks testified that he only traveled to Tucson to work for JDM three times per month and stated: "Generally speaking, I work between 30 and 40 percent of a month, as much as 50, depending on the needs of the organization." (Doc. 327-3, pg. 8).

Notably, Mr. Crooks did not even consider himself to be JDM's CFO. *See* (Doc. 327-4, pg. 7) ("Q. Okay. And when you say you were the CFO, was that an official job title that you held or -- A. No. Q. No? I mean, did your e-mail -- did your e-mail say that you were a CFO? A. No. Q. Did you ever hold yourself out as a CFO on behalf of the company? A. No. Q. Do you know if the company ever held you out as a CFO? A. I don't know that I could answer that."). Furthermore, during Mr. Crooks's two depositions, he made abundantly clear that he lacked personal knowledge of company details, finances, and operations on multiple occasions.

> Q. And your damages opinions in this case are based on your review of financial statements and financial records that were prepared by other people prior to your employment as a consultant for the company; is that correct?
> A. Correct, in addition to conversations that I would have and -- and discussions that I would have with many people.
> Q. So it's based on hearsay and documents that predate your arrival at the company; correct?
> A. Define hearsay.
> Q. Something that somebody else tells you.
> A. Yes.

(Doc. 327-4, pg. 9).

> Q: Who prepared the company's financials during the time period of 2010 to 2013?
> A: I'm not sure.

(Doc. 327-3, pg. 16).

>Q: And you don't know why the company moved towards print and broadcast media and away from digital marketing?
>A: I have no firsthand knowledge of that.

(Doc. 327-3, pg. 17)

>Q. The agency turnover, was this all external agents that you are referring to --
>A. Yes.
>Q. -- in 2015?
>A. '14, yes.
>Q. Is it '14 or --
>A. '14 was the period of turnover. '15 was when the financial performance declined.
>Q. And are you aware of any attempts by the defendants to facilitate that turnover?
>A. Not directly.
>Q. What do you mean by "not directly"?
>A. I'm not aware of anything directly. If I read the Linton report, there seems to be some interference and impairment discussion, but I don't have an opinion on that.
>Q. You don't have any personal knowledge of that?
>A. Correct. I wasn't here.

(Doc. 327-3, pg. 18).

>Q. Tell me what you know about this document.
>A. So in terms of the history of how the document was stolen, I don't have firsthand knowledge of that. I've only been asked to calculate what the damages would be given the assumption that this was stolen on the dates and time that it was.

(Doc. 327-4, pg. 17).

>Q. And how many internal agents did the company have in that time period 2010 to the end of 2013?
>A. I think that would have been in that range. Maybe at the bottom it would have been maybe 10 to 25.
>Q. Well, it couldn't have been greater than 25 because that was the most the company ever had; correct?
>A. Correct. And that was the period that it was the highest.
>Q. And what is the basis of your testimony? Obviously you weren't at the company, so you don't know this personally; correct?

A. Conversations with Kristin Reasco and also conversations with Josh Mellberg

(Doc. 327-4, pg. 16).

    Q. What evidence is there that that data was taken?
    A. I don't know of that personally and I haven't been asked to --
    Q. Okay.
    A. -- to -- to judge that.

(Doc. 327-4, pg. 29).

While there is no requirement that a corporate executive be employed for a specific period of time in order to develop the experience necessary to fulfill the personal knowledge requirement of Rule 701, it appears that Mr. Crooks's part-time experience as a consultant in finance, and interim JDM CFO did not endow him with the appropriate experience to possess the particularized knowledge of JDM's financials for him to testify as a lay witness.

    B. *Specialized Knowledge*

Rules 701 also requires that Mr. Crooks's testimony not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." While it appears that any testimony that requires some specialized knowledge removes it from the ambit of Rule 701, courts have acknowledged certain exceptions to this rule.

The Advisory Committee notes to Rule 701 provides one such example:

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., *Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

2000 Advisory Comm. Notes, Fed. R. Evid. 701.

Plaintiffs allege that Mr. Crooks should be permitted to provide damages

calculations without being qualified as an expert due to his position as JDM's CFO. *See* (Doc. 317, pg. 6) ("Here, Mr. Crooks has knowledge based on his experience as JDM's interim CFO and his review of the company's business records."); *Id.* at 10 ("Indeed, as he served as JDM's interim CFO, Mr. Crooks is a proper corporate representative to testify concerning corporate financial statements and records."); *Id.* at 17 ("[I]t is beyond dispute that Mr. Crooks, as JDM's CFO, can testify as a lay witness on the topic of the cost of developing JDM's trade secrets based upon JDM's financial records."). Defendants counter that Mr. Crooks is an expert witness posing as a lay witness. *See* (Doc. 310, pg. 6-7) ("Crooks is not qualified as a lay witness because his damages testimony is not based on his personal knowledge or observations, but is based, if anything, on specialized or technical knowledge obtained through his financial consulting experience.").

Plaintiffs further allege that "Courts have repeatedly affirmed the admissibility of testimony as lay witness testimony where corporate executives use business records to perform arithmetic damages calculations." (Doc. 317, pg. 5). In these types of cases, business owners and corporate executives have been routinely permitted to testify as lay witnesses based on their personal knowledge of the company and company finances. *See, e.g.*, *Servicios Aereos Del Centro S.A. de C.V. v. Honeywell Int'l, Inc.*, No. 2:03 CV 1993 JWS, 2006 WL 2709836, at *1 (D. Ariz. Aug. 23, 2006) (permitting executive president of company to testify as lay witness to value of company property); *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, No. 1:13-CV-296-BLW, 2015 WL 1020644, at *6 (D. Idaho Mar. 9, 2015) (permitting President and CFO of company to "testify about damages using their personal knowledge of the company and personal experience preparing various financial documents. Given [their] positions and their experiences in developing financial calculations for the company, they may testify about lost profits to the extent that they have personal and particularized knowledge of the facts that form their opinions"); *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 168–69 (5th Cir. 2010) (upholding district court's decision to permit CFO to testify about lost profits as a lay witness because CFO was familiar with the company's finances); *Texas A&M Research Found. v. Magna*

*Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003) ("Indeed, an officer or employee of a corporation may testify to industry practices and pricing without qualifying as an expert."); *Best W. Int'l, Inc. v. Patel*, No. CV 04-02307-PHX-JAT, 2008 WL 205286, at *3 (D. Ariz. Jan. 23, 2008) (court permitting a hotel owner to testify about the value of his hotel because "he was completely familiar with the books of the hotel in question"); *United States v. Lindsey*, 680 F. App'x 563, 566 (9th Cir. 2017) ("The district court did not abuse its discretion in permitting lenders' employees to testify as lay witnesses rather than as expert witnesses . . . [defendant] has offered no explanation for why the witnesses' testimony, which was based on their personal observations while working for the lenders—rather than on scientific, technical, or specialized knowledge—did not qualify as lay testimony.").

Although there is an abundance of case law where corporate employees are permitted to testify about damages or company valuation without qualifying as an expert, upon examining the record, it is evident that Mr. Crooks's testimony is not based on his personal knowledge of JDM, but rather upon his own specialized knowledge developed over his many years in the industry. Mr. Crooks testified that he had a very limited role in reviewing JDM's 2016 financials because he "just literally wasn't [t]here enough." (Doc. 327-3, pg. 12). For JDM's 2017 financials he "had a slightly more involved review of the financials." *Id.* Furthermore, by July 2018, Mr. Crooks was no longer interim CFO of JDM. *See* (Doc. 327-3, pg. 9) ("Q: So, sitting here today, are you the CFO of the company or are you not? A: I am not"). However, the issue here is not that the statements and financial records that Mr. Crooks relies on to base his damages opinions predate him, but that Mr. Crooks is not utilizing any of his own personal knowledge of the inner-workings of JDM in his capacity as either interim CFO or finance consultant.

During Mr. Crooks's depositions he consistently testified that he utilized his industry experience and professional judgment to determine his calculations.

> I leveraged my industry experience on that. What I found through time is just because someone didn't sell something the first year, they can -- there are sales that happen the second, third, fourth, fifth, sixth year. In fact, in my prior business, we tracked that very uniquely and found that our productivity

> for each one of those appointments or clients stayed relatively the same through a 10-year period.

(Doc. 327-4, pg. 32).

> Q. When were you first asked to provide this calculation?
> A. Same time period.
> Q. Over the last couple weeks?
> A. Last few weeks.
> Q. Last few weeks. So within the last three weeks?
> A. I don't recall the exact date, but --
> Q. Who asked you to do it?
> A. Josh Mellberg.
> Q. Why did he ask you to do this if the company's already engaged Mr. Kotzin as a damages expert?
> MR. BRAY: Objection; foundation.
> A. I think to leverage my experience in the industry.
> BY MR. KURTZ:
> Q. To leverage your experience in the industry, what does that mean?
> A. I have several years within the insurance and financial industries, and my understanding of damages might be different than Linton's. I don't know that for a fact. That's my speculation.

(Doc. 327-3, pg. 13).

> Q. But you had to use your professional judgment to make those calls; correct?
> A. I did.

(Doc. 327-4, pg. 31).

In addition, although Plaintiffs insist that Mr. Crooks is a lay witness and provide a myriad of cases purportedly showing that courts have repeatedly affirmed the admissibility of testimony as lay witness testimony where corporate executives use business records to perform damages calculations, those cases generally involve straightforward arithmetic applied to calculate damages. For example, Plaintiffs cite *United States v. Aubrey*, 800 F.3d 1115, 1129 (9th Cir. 2015) for the proposition that "the Ninth Circuit rejected exactly the approach Defendants are asking this court to take: see one complex-sounding concept and reject the witness outright." In *Aubrey*, the court held that although a witness "might have been eligible to be certified as an expert, the district court properly restricted his testimony

to the areas in which he had personal knowledge (the documents, investigation, and the methods he used to prepare his summary) and **prevented him from providing in-depth analysis of various accounting methods**." *United States v. Aubrey*, 800 F.3d 1115, 1129 (9th Cir. 2015) (emphasis added).

In another case cited by Plaintiffs, *Lightning Lube, Inc. v. Witco Corp.*, a franchise owner was permitted to testify as a lay witness to calculate lost profits.

In that case:

> [The Franchise Owner] calculated future profits in two ways. First, he calculated the profits he would have earned on the 117 franchise contracts that he actually sold. [The Franchise Owner] predicted that after four years in business each center would have been generating $28,000 in royalty fees. Given this calculation, plus the money the franchisees would have earned in the first four years, [the Franchise Owner] predicted that he would have earned $27,729,000 in future profits from the 117 existing contracts through 1996. Next, [the Franchise Owner] calculated the lost profits on the franchises he expected to have sold. Based on projections he developed with an accounting firm when he was planning to take the company public, [the Franchise Owner] predicted that he would have sold 370 more franchises over the ten-year period, that all of them would have opened (37 a year), and that he would have earned $43,821,000 from these franchises using the formula discussed above.

4 F.3d at 1174–75; *see also State Office Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843 (10th Cir. 1985) (allowing business owner to testify and calculate that business's lost profits equaled its lost profit per computer times 29 lost sales).

However, unlike those cases that involve simple arithmetic, Mr. Crooks's calculations are not the type of straightforward calculations generally permitted by courts from lay witnesses, despite Plaintiffs' assertions to the contrary. *See* (Doc. 317, pg. 9-10) ("Mr. Crooks' calculations comprise straight forward mathematical operations applied to JDM's financial statements, which any corporate executive or officer charged with finance could perform that result in a statement of the costs attributable to the development of JDM's trade secrets."). An analysis of Mr. Crooks's own testimony reveals that his calculations involve sophisticated financial concepts including "learning curves," "fully

trained rates," "break even rates," and "break even points."

> Q. You used your professional judgment and knowledge of the industry to do that?
> A. No, I actually analyzed the data for each month and -- and picked the point where the curve flattened out of the learning curve and that became the fully trained rate or the break even rate.
> Q. Okay.
> A. That did match my experience within the industry.

(Doc. 327-4, pg. 35).

> And what this analysis resulted in is it takes 18 months for an advisor once they've been found and trained to come up to a rate, in this case, it's a break even rate, that they become productive. And that's why there's so many restrictions, and not just JDM's but other companies -- you know, don't compete with this, don't leave. And that's why there's so many incentives on that as that becomes very valuable. I sampled about 5,000 appointments. I couldn't go back to the period because the data wasn't clean enough to do that way back then, but I was able to go back and sample 5,000 appointments and create a slice by tenure of all these advisors which created this curve that's here.

(Doc. 327-4, pg. 33).

> A. I actually analyzed the data by month and that's where things leveled out.
> Q. And when you say leveled out, what do you mean?
> A. Leveled out to -- basically they ceased to learn very much after about 18 months. They became -- their productivity became level.
> Q. Okay.
> A. And then we calculated that to the break even point.

(Doc. 327-4, pg. 34-35).

> Yeah. So essentially the damages that JDM would incur by this spike in turnover that occurred in that sensitive period is to go out and retrain -- rehire, retrain new advisors and start the learning curve over again.

(Doc. 327-4, pg. 37).

Courts do not permit lay witness testimony when that testimony involves the use of a sophisticated damages calculation. *Compare LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) ("In this case, Mr. Livingston testified only regarding LifeWise's fourth damages model. The model concerned moving averages, compounded

- 12 -

growth rates, and S-curves. Mr. Livingston could not testify about these technical, specialized subjects under Rule 701."); *with Everett Fin., Inc. v. Primary Residential Mortg., Inc.*, No. 3:14-CV-1028-D, 2018 WL 2441829, at *4 (N.D. Tex. May 31, 2018) (Court permitting company executives to provide lay testimony as to damages because executives "used a widely-accepted and simple method of measuring lost profits [lost loan volume multiplied by a profit margin]".).

Rule 701 prohibits testimony that utilizes sophisticated financial concepts like "learning curves," "fully trained rates," "break even rates," and "break even points." At one point, Mr. Crooks even testified that he developed a "cost-allocation strategy." *See* (Doc. 327-4, pg. 31) ("The next step was to create an allocation strategy based on what costs were 100 percent allocated. And those were advertising and digital and other."). It is evident that rather than utilizing his personal knowledge garnered from his experience as JDM's interim CFO, Mr. Crooks has conducted his analysis of JDM's financials utilizing specialized knowledge that is properly within the purview of Rule 702.

2. *Will Defendants Suffer Prejudice?*

Since Mr. Crooks is providing expert testimony, the Court will next determine whether his late disclosure is prejudicial. Although Plaintiffs disclosed that they were seeking over $85 million in damages in their August 2015 Disclosure, that initial disclosure statement was submitted to Defendants at a relatively early stage in the litigation and was unsupported by any financial analysis or calculations. Plaintiffs allege that this early stage allegation of $85 million in damages provided Defendants with adequate notice. (Doc. 317, pg. 2) ("Thus, although Defendants disingenuously argue that JDM seeks to increase its damages from $16 million to $95 million, in reality Defendants have known for years that JDM was seeking over $85 million from early on in this litigation, and thus, cannot seriously contend they are now somehow surprised that JDM is seeking over $95 million.").

Ordinarily, parties should strive to provide clear and timely disclosures. The expert witness deadline lapsed in May 2017 and Plaintiffs chose only to disclose Mr. Kotzin as

- 13 -

an expert witness on damages. Plaintiffs also elected only to provide the Kotzin report, which merely covered two categories of damages. Plaintiffs were keenly aware that majority of their damages categories still required additional input. Plaintiffs could have requested an extension of the expert witness deadline but neglected to do so. "Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Plaintiffs assert that their delay in disclosure is harmless, but Plaintiffs' arguments solely rely on their contention that Mr. Crooks is a lay witness. *See* (Doc. 317, pg. 17) (Plaintiffs claim that Defendants will not be prejudiced by their inability to submit a rebuttal expert report because Mr. Crooks is a lay witness, and "there is no such thing as a rebuttal lay witness report.").

Defendants allege that "[i]f Plaintiffs had properly and timely disclosed Crooks and his $80 million in new damages, then Defendants would have: (1) subpoenaed him to obtain all supporting documents, data, and communications; (2) submitted a rebuttal expert report; and (3) had the opportunity to conduct follow-up discovery to test the assumptions and data underlying Crooks' analysis." (Doc. 310, pg. 16). The Court finds Defendants' argument convincing. Not only is it concerning that Plaintiffs elected to provide their September 2018 Disclosure without any supporting documentation, but Plaintiffs' disclosure was also knowingly belated and deprived Defendants of the ability to properly respond. The September 2018 Disclosure should be treated as an expert report and Defendants should have had the opportunity to conduct follow-up discovery and challenge Mr. Crooks's expert opinion with a rebuttal expert report and additional discovery.

*3. What is the Appropriate Sanction for the Late Disclosure?*

Since the Court has determined that Mr. Crooks is providing expert testimony and that Defendants will suffer prejudice from the late disclosure, the Court's final inquiry relates to the appropriate sanction. The Court notes that this is not a case involving an untimely disclosure for a legitimate reason. Rather, Plaintiffs provide no explanation for their belated disclosure. Rather, Plaintiffs candidly admit that the disclosure was late, but,

rationalize it by writing: "at most, Crooks' Calculations were only four months late." (Doc. 317, pg. 20).

Fed. R. Civ. P. 26(a)(1)(A)(iii) requires parties to disclose a computation of each category of damages in a timely manner. Plaintiffs timely disclosed that they were seeking over $85 million in damages in August 2015. They timely disclosed computations for some damage categories in the Kotzin Report, but postponed disclosing the majority of those computations until September 2018. "Courts are more likely to exclude damages evidence when a party first discloses its computation of damages shortly before trial or substantially after discovery has closed." *Martin v. Collier*, No. 2:11-CV-00320-LRH, 2012 WL 2564890, at *2 (D. Nev. July 2, 2012). *See also, e.g.*, *Quevedo v. Trans-Pac. Shipping, Inc.*, 143 F.3d 1255, 1258 (9th Cir. 1998) (upholding district court decision to refuse to consider expert report because it was filed one and a half months late when plaintiff could have requested an extension of time).

There is a strong presumption that matters should be adjudicated on the merits, but this presumption must be balanced with an attorney's obligation to timely provide information to its adversaries. Even though Plaintiffs' extraordinarily late disclosure can possibly be mitigated by re-opening discovery, exclusion is the appropriate sanction. The Court believes Plaintiffs are fully aware that Mr. Crooks's testimony is properly situated as expert testimony and have introduced him in as a lay witness to circumvent the long-expired expert witness deadline. Not only is Plaintiffs' strategy concerning, their attitude with respect to their late disclosure by claiming it is "only 4 months" late is troublesome. Deadlines are in place to be respected.

Further compounding Plaintiffs' current discovery violation is their litany of prior transgressions and inability to fairly engage in the discovery process. The record is littered with countless examples of Plaintiffs failing to: meet deadlines, reasonably negotiate with Defendants, and follow court orders. *See, e.g.*, (Doc. 209, pg. 3) ("The Court directed the parties to meet and confer regarding both search terms and the process for the search. After two months, agreement has not been reached and it appears Plaintiffs are impeding

progress."); *id.* at 4 ("Because Plaintiffs did not timely propound formal discovery as required by the Federal Rules, the Court upheld Defendant Impact's objection to responding to Plaintiffs' untimely informal request."); (Doc. 199, pg. 3) ("At the February status conference, Defendant Impact Partnership expressed concern about the completeness of Plaintiffs' responses to its document requests . . . At the recent March conference, the parties had not reached agreement. Although Plaintiffs have begun to conduct searches, they had not negotiated with Defendant on the terms to be used or the process, as the Court had intended."); (Doc. 217, pg. 2) ("The Court's deadline in the April 19 Order was firm, as reflected in the set deadline of May 7 for Defendants to respond to Plaintiffs' brief on this topic. The Court has encouraged the parties to meet and confer and believes issues are best resolved between counsel. But, this case is old and firm deadlines are necessary to complete discovery in the limited time remaining. Because Plaintiffs did not comply with the Court's deadline, the Court will not allow the discovery as requested by Plaintiffs."); (Doc. 223, pg. 2-3) ("At the status conference, the Court directed the parties to brief this issue. The Court notes that this is the third Court deadline Plaintiffs' counsel has missed without seeking an extension. This has occurred despite Plaintiffs' counsel repeatedly affirming their preference for the Court to assist the parties by overseeing the discovery schedule."); (Doc. 234, pg. 3-4) ("Plaintiffs did not produce any documents until four months after the protective order was entered . . . Defendant has identified responsive documents that were not produced as well as 'gaps' in Mellberg emails that indicate a lack of production . . . However, after the Court reviewed the extensive exhibits provided by Defendant and the evidence provided by Plaintiffs, as summarized above, it is persuaded that Plaintiffs' search for emails has not been adequate."); (Doc. 246, pg. 4) ("Plaintiffs failed to fully comply with the requirements of the Order."); (Doc. 246, pg. 5, n.3) ("Counsel for Defendant Will indicated, at the May 9 status conference, that he had informed Plaintiffs of his willingness to allow a search within the parameters now being ordered by the Court. If Plaintiffs had acceded to this reasonable negotiation position during the meet and confer process, the Court's involvement could

have been minimized."); (Doc. 271, pg. 2) ("Plaintiffs did not meet that deadline and did not notify opposing counsel or the Court of their inability to do so."); (Doc. 271, pg. 4) ("Plaintiffs requested that the mirror images be searched by someone other than the individual Defendants and they were granted two rounds of keyword searches by a neutral vendor. Therefore, the Court assumes almost all relevant documents were produced during that process. To the extent any relevant documents were missed, that was discoverable by Plaintiffs from the DTI spreadsheets. The Court has already denied discovery based on those spreadsheets. Plaintiffs' attempt to evade that denial will not be allowed.").

Considering the numerous discovery violations committed by Plaintiffs, the complete lack of an explanation as to the belated disclosure, the extreme untimeliness of the disclosure, and the prejudice to Defendants, the Court finds that exclusion is the appropriate remedy.

Accordingly, IT IS ORDERED:

1. Defendants' Motion to Exclude Plaintiffs' Untimely Damages Evidence (Doc. 310) is granted.
2. Mr. Crooks's lay testimony in the form of the September 2018 disclosure is excluded.
3. Mr. Crooks may not provide testimony as a lay or expert witness in this case.

Dated this 16th day of April, 2019.

Honorable Cindy K. Jorgenson
United States District Judge